JONES, SUPERINTENDENT, GREAT MEADOW
CORRECTIONAL FACILITY, ET AL. *v.* BARNES

No. 81-1794.   Argued February 22, 1983—Decided July 5, 1983

*Barbara D. Underwood* argued the cause for petitioners. With her on the briefs was *Elizabeth Holtzman.*

*Sheila Ginsberg Riesel* argued the cause for respondent. With her on the brief was *Alan Mansfield.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether defense counsel assigned to prosecute an appeal from a criminal conviction has a constitutional duty to raise every nonfrivolous issue requested by the defendant.

## I

In 1976, Richard Butts was robbed at knifepoint by four men in the lobby of an apartment building; he was badly

---

*\*Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey, Edwin S. Kneedler,* and *Deborah Watson* filed a brief for the United States as *amicus curiae* urging reversal.

*J. Vincent Aprile II* filed a brief for the National Legal Aid and Defender Association as *amicus curiae* urging affirmance.

beaten and his watch and money were taken. Butts informed a Housing Authority detective that he recognized one of his assailants as a person known to him as "Froggy," and gave a physical description of the person to the detective. The following day the detective arrested respondent David Barnes, who is known as "Froggy."

Respondent was charged with first- and second-degree robbery, second-degree assault, and third-degree larceny. The prosecution rested primarily upon Butts' testimony and his identification of respondent.[1]  During cross-examination, defense counsel asked Butts whether he had ever undergone psychiatric treatment; however, no offer of proof was made on the substance or relevance of the question after the trial judge *sua sponte* instructed Butts not to answer.  At the close of trial, the trial judge declined to give an instruction on accessorial liability requested by the defense.  The jury convicted respondent of first- and second-degree robbery and second-degree assault.

The Appellate Division of the Supreme Court of New York, Second Department, assigned Michael Melinger to represent respondent on appeal.  Respondent sent Melinger a letter listing several claims that he felt should be raised.[2] Included were claims that Butts' identification testimony should have been suppressed, that the trial judge improperly excluded psychiatric evidence, and that respondent's trial counsel was ineffective.  Respondent also enclosed a copy of a *pro se* brief he had written.

In a return letter, Melinger accepted some but rejected most of the suggested claims, stating that they would not aid

---

[1] This identification, which took place in a one-on-one meeting arranged by the police, was the subject of a pretrial hearing.  The trial judge found it unnecessary to rule on the validity of that identification.  He concluded that Butts' subsequent in-court identification was based upon an independent source, since Butts had known respondent for several years prior to the robbery.

[2] Respondent's letter is not in the record.  Its contents may be inferred from Melinger's letter in response.

respondent in obtaining a new trial and that they could not be raised on appeal because they were not based on evidence in the record. Melinger then listed seven potential claims of error that he was considering including in his brief, and invited respondent's "reflections and suggestions" with regard to those seven issues. The record does not reveal any response to this letter.

Melinger's brief to the Appellate Division concentrated on three of the seven points he had raised in his letter to respondent: improper exclusion of psychiatric evidence, failure to suppress Butts' identification testimony, and improper cross-examination of respondent by the trial judge. In addition, Melinger submitted respondent's own *pro se* brief. Thereafter, respondent filed two more *pro se* briefs, raising three more of the seven issues Melinger had identified.

At oral argument, Melinger argued the three points presented in his own brief, but not the arguments raised in the *pro se* briefs. On May 22, 1978, the Appellate Division affirmed by summary order, *New York* v. *Barnes*, 63 App. Div. 2d 865, 405 N. Y. S. 2d 621 (1978). The New York Court of Appeals denied leave to appeal, *New York* v. *Barnes*, 45 N. Y. 2d 786 (1978).

On August 8, 1978, respondent filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. Respondent raised five claims of error, including ineffective assistance of trial counsel. The District Court held the claims to be without merit and dismissed the petition. *United States ex rel. Barnes* v. *Jones*, No. 78-C-1717 (Nov. 27, 1978). The Court of Appeals for the Second Circuit affirmed, 607 F. 2d 994, and we denied a petition for a writ of certiorari, 444 U. S. 853 (1979).

In 1980, respondent filed two more challenges in state court. On March 4, 1980, he filed a motion in the trial court for collateral review of his sentence. That motion was denied on April 28, and leave to appeal was denied on October 3. Meanwhile, on March 31, 1980, he filed a petition in the

New York Court of Appeals for reconsideration of that court's denial of leave to appeal. In that petition, respondent for the first time claimed that his *appellate* counsel, Melinger, had provided ineffective assistance. The New York Court of Appeals denied the application on April 16, 1980, *New York* v. *Barnes*, 49 N. Y. 2d 1001.

Respondent then returned to United States District Court for the second time, with a petition for habeas corpus based on the claim of ineffective assistance by appellate counsel. The District Court concluded that respondent had exhausted his state remedies, but dismissed the petition, holding that the record gave no support to the claim of ineffective assistance of appellate counsel on "any . . . standard which could reasonably be applied." No. 80–C–2447 (EDNY, Jan. 30, 1981), reprinted in App. to Pet. for Cert. 28a. The District Court concluded:

> "It is not required that an attorney argue every conceivable issue on appeal, especially when some may be without merit. Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach." *Id.*, at 28a–29a.

A divided panel of the Court of Appeals reversed, 665 F. 2d 427 (1981).[3] Laying down a new standard, the majority held that when "the appellant requests that [his attorney] raise additional colorable points [on appeal], counsel *must argue the additional points to the full extent of his professional ability*." *Id.*, at 433 (emphasis added). In the view of the majority, this conclusion followed from *Anders* v. *California*, 386 U. S. 738 (1967). In *Anders*, this Court held that an appointed attorney must advocate his client's cause vigorously and may not withdraw from a nonfrivolous appeal.

---

[3] By this time, at least 26 state and federal judges had considered respondent's claims that he was unjustly convicted for a crime committed five years earlier; and many of the judges had reviewed the case more than once. Until the latest foray, all courts had rejected his claims.

The Court of Appeals majority held that, since *Anders* bars counsel from abandoning a nonfrivolous appeal, it also bars counsel from abandoning a nonfrivolous issue on appeal.

> "[A]ppointed counsel's unwillingness to present particular arguments at appellant's request functions not only to abridge defendant's right to counsel on appeal, but also to limit the defendant's constitutional right of equal access to the appellate process . . . ." 665 F. 2d, at 433.

The Court of Appeals went on to hold that, "[h]aving demonstrated that appointed counsel failed to argue colorable claims at his request, an appellant need not also demonstrate a likelihood of success on the merits of those claims." *Id.*, at 434.

The court concluded that Melinger had not met the above standard in that he had failed to press at least two nonfrivolous claims: the trial judge's failure to instruct on accessory liability and ineffective assistance of trial counsel. The fact that these issues had been raised in respondent's own *pro se* briefs did not cure the error, since "[a] pro se brief is no substitute for the advocacy of experienced counsel." *Ibid.* The court reversed and remanded, with instructions to grant the writ of habeas corpus unless the State assigned new counsel and granted a new appeal.

Circuit Judge Meskill dissented, stating that the majority had overextended *Anders.* In his view, *Anders* concerned only whether an attorney must pursue nonfrivolous *appeals;* it did not imply that attorneys must advance all nonfrivolous *issues.*

We granted certiorari, 457 U. S. 1104 (1982), and we reverse.

## II

In announcing a new *per se* rule that appellate counsel must raise every nonfrivolous issue requested by the client,[4]

---

[4] The record is not without ambiguity as to what respondent requested. We assume, for purposes of our review, that the Court of Appeals majority

the Court of Appeals relied primarily upon *Anders* v. *California, supra*. There is, of course, no constitutional right to an appeal, but in *Griffin* v. *Illinois*, 351 U. S. 12, 18 (1956), and *Douglas* v. *California*, 372 U. S. 353 (1963), the Court held that if an appeal is open to those who can pay for it, an appeal must be provided for an indigent. It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal, see *Wainwright* v. *Sykes*, 433 U. S. 72, 93, n. 1 (1977) (BURGER, C. J., concurring); ABA Standards for Criminal Justice 4–5.2, 21–2.2 (2d ed. 1980). In addition, we have held that, with some limitations, a defendant may elect to act as his or her own advocate, *Faretta* v. *California*, 422 U. S. 806 (1975). Neither *Anders* nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.

This Court, in holding that a state must provide counsel for an indigent appellant on his first appeal as of right, recognized the superior ability of trained counsel in the "examination into the record, research of the law, and marshalling of arguments on [the appellant's] behalf," *Douglas* v. *California, supra*, at 358. Yet by promulgating a *per se* rule that the client, not the professional advocate, must be allowed to decide what issues are to be pressed, the Court of Appeals seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation.

Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible,

---

correctly concluded that respondent insisted that Melinger raise the issues identified, and did not simply accept Melinger's decision not to press those issues.

or at most on a few key issues. Justice Jackson, after observing appellate advocates for many years, stated:

"One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one. . . . [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one." Jackson, Advocacy Before the United States Supreme Court, 25 Temple L. Q. 115, 119 (1951).

Justice Jackson's observation echoes the advice of countless advocates before him and since. An authoritative work on appellate practice observes:

"Most cases present only one, two, or three significant questions . . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones." R. Stern, Appellate Practice in the United States 266 (1981).[5]

There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. This

---

[5] Similarly, a manual on practice before the Court of Appeals for the Second Circuit declares: "[A] brief which treats more than three or four matters runs serious risks of becoming too diffuse and giving the overall impression that no one claimed error can be serious." Committee on Federal Courts of the Association of the Bar of the City of New York, Appeals to the Second Circuit 38 (1980).

has assumed a greater importance in an era when oral argument is strictly limited in most courts—often to as little as 15 minutes—and when page limits on briefs are widely imposed. See, *e. g.*, Fed. Rule App. Proc. 28(g); McKinney's New York Rules of Court §§ 670.17(g)(2), 670.22 (1982). Even in a court that imposes no time or page limits, however, the new *per se* rule laid down by the Court of Appeals is contrary to all experience and logic. A brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, "go for the jugular," Davis, The Argument of an Appeal, 26 A. B. A. J. 895, 897 (1940)—in a verbal mound made up of strong and weak contentions. See generally, *e. g.*, Godbold, Twenty Pages and Twenty Minutes—Effective Advocacy on Appeal, 30 Sw. L. J. 801 (1976).[6]

This Court's decision in *Anders*, far from giving support to the new *per se* rule announced by the Court of Appeals, is to

---

[6] The ABA Model Rules of Professional Conduct provide:

"A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. . . . In a criminal case, the lawyer shall abide by the client's decision, . . . *as to a plea to be entered, whether to waive jury trial and whether the client will testify.*" Model Rules of Professional Conduct, Proposed Rule 1.2(a) (Final Draft 1982) (emphasis added).

With the exception of these specified fundamental decisions, an attorney's duty is to take professional responsibility for the conduct of the case, after consulting with his client.

Respondent points to the ABA Standards for Criminal Appeals, which appear to indicate that counsel should accede to a client's insistence on pressing a particular contention on appeal, see ABA Standards for Criminal Justice 21–3.2, p. 21·42 (2d ed. 1980). The ABA Defense Function Standards provide, however, that, with the exceptions specified above, strategic and tactical decisions are the exclusive province of the defense counsel, after consultation with the client. See *id.*, 4–5.2. See also ABA Project on Standards for Criminal Justice, The Prosecution Function and The Defense Function § 5.2 (Tent. Draft 1970). In any event, the fact that the ABA may have chosen to recognize a given practice as desirable or appropriate does not mean that that practice is required by the Constitution.

the contrary. *Anders* recognized that the role of the advocate "requires that he support his client's appeal to the best of his ability." 386 U. S., at 744. Here the appointed counsel did just that. For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. Nothing in the Constitution or our interpretation of that document requires such a standard.[7] The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE BLACKMUN, concurring in the judgment.

I do not join the Court's opinion, because I need not decide in this case, *ante*, at 751, whether there is or is not a constitutional right to a first appeal of a criminal conviction, and because I agree with JUSTICE BRENNAN, and the American Bar Association, ABA Standards for Criminal Justice 21–3.2, Comment, p. 21·42 (2d ed. 1980), that, as an *ethical* matter, an attorney should argue on appeal all nonfrivolous claims upon which his client insists. Whether or not one agrees with the Court's view of legal strategy, it seems to me that the lawyer, after giving his client his best opinion as to the course most likely to succeed, should acquiesce in the client's choice of which nonfrivolous claims to pursue.

Certainly, *Anders* v. *California*, 386 U. S. 738 (1967), and *Faretta* v. *California*, 422 U. S. 806 (1975), indicate that the attorney's usurpation of certain fundamental decisions can

---

[7] The only question presented by this case is whether a criminal defendant has a constitutional right to have appellate counsel raise every nonfrivolous issue that the defendant requests. The availability of federal habeas corpus to review claims that counsel declined to raise is not before us, and we have no occasion to decide whether counsel's refusal to raise requested claims would constitute "cause" for a petitioner's default within the meaning of *Wainwright* v. *Sykes*, 433 U. S. 72 (1977). See also *Engle* v. *Isaac*, 456 U. S. 107, 128 (1982).

violate the Constitution.   I agree with the Court, however, that neither my view, nor the ABA's view, of the ideal allocation of decisionmaking authority between client and lawyer necessarily assumes constitutional status where counsel's performance is "within the range of competence demanded of attorneys in criminal cases," *McMann* v. *Richardson*, 397 U. S. 759, 771 (1970), and "assure[s] the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process," *Ross* v. *Moffitt*, 417 U. S. 600, 616 (1974).   I agree that both these requirements were met here.

But the attorney, by refusing to carry out his client's express wishes, cannot forever foreclose review of nonfrivolous constitutional claims.   As I noted in *Faretta* v. *California*, 422 U. S., at 848 (dissenting opinion), "[f]or such overbearing conduct by counsel, there is a remedy," citing *Brookhart* v. *Janis*, 384 U. S. 1 (1966), and *Fay* v. *Noia*, 372 U. S. 391, 439 (1963).   The remedy, of course, is a writ of habeas corpus.   Thus, while the Court does not reach the question, *ante*, at 754, n. 7, I state my view that counsel's failure to raise on appeal nonfrivolous constitutional claims upon which his client has insisted must constitute "cause and prejudice" for any resulting procedural default under state law.   See *Wainwright* v. *Sykes*, 433 U. S. 72 (1977).

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the *Assistance* of Counsel for his defence" (emphasis added).   I find myself in fundamental disagreement with the Court over what a right to "the assistance of counsel" means.   The import of words like "assistance" and "counsel" seems inconsistent with a regime under which counsel appointed by the State to represent a criminal defendant can refuse to raise issues with arguable merit on appeal when his client, after hearing his assessment of the case and his advice, has di-

rected him to raise them. I would remand for a determination whether respondent did in fact insist that his lawyer brief the issues that the Court of Appeals found were not frivolous.

It is clear that respondent had a right to the assistance of counsel in connection with his appeal. "As we have held again and again, an indigent defendant is entitled to the appointment of counsel to assist him on his first appeal . . . ." *Entsminger* v. *Iowa*, 386 U. S. 748, 751 (1967) (citations omitted).[1] In recognizing the right to counsel on appeal, we

---

[1] The Court surprisingly announces that "[t]here is, of course, no constitutional right to an appeal." *Ante*, at 751. That statement, besides being unnecessary to its decision, is quite arguably wrong. In *Griffin* v. *Illinois*, 351 U. S. 12 (1956), the fifth member of the majority, Justice Frankfurter, expressed doubt that there was a constitutional right to an appeal:

"[N]either the unfolding content of 'due process' nor the particularized safeguards of the Bill of Rights disregard procedural ways that reflect a national historic policy. It is significant that no appeals from convictions in the federal courts were afforded (with roundabout exceptions negligible for present purposes) for nearly a hundred years; and, despite the civilized standards of criminal justice in modern England, there was no appeal from convictions (again, with exceptions not now pertinent) until 1907. Thus, it is now settled that due process of law does not require a State to afford review of criminal judgments." *Id.*, at 20–21.

If the question were to come before us in a proper case, I have little doubt that the passage of nearly 30 years since *Griffin* and some 90 years since *McKane* v. *Durston*, 153 U. S. 684 (1894), upon which Justice Frankfurter relied, would lead us to reassess the significance of the factors upon which Justice Frankfurter based his conclusion. I also have little doubt that we would decide that a State must afford at least some opportunity for review of convictions, whether through the familiar mechanism of appeal or through some form of collateral proceeding. There are few, if any, situations in our system of justice in which a single judge is given unreviewable discretion over matters concerning a person's liberty or property, and the reversal rate of criminal convictions on mandatory appeals in the state courts, while not overwhelming, is certainly high enough to suggest that depriving defendants of their right to appeal would expose them to an unacceptable risk of erroneous conviction. See Kagan, Cartwright, Friedman, & Wheeler, The Evolution of State Supreme Courts, 76 Mich. L.

have expressly relied not only on the Fourteenth Amendment's Equal Protection Clause, which in this context prohibits disadvantaging indigent defendants in comparison to those who can afford to hire counsel themselves, but also on its Due Process Clause and its incorporation of Sixth Amendment standards. See *Anders* v. *California*, 386 U. S. 738, 744 (1967); *Griffin* v. *Illinois*, 351 U. S. 12, 17 (1956); cf. *Johnson* v. *United States*, 352 U. S. 565, 566 (1957); *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463 (1938). The two theories converge in this case also. Cf. *Bearden* v. *Georgia*, 461 U. S. 660, 665 (1983). A State may not incarcerate a person, whether he is indigent or not, if he has not had (or waived) the assistance of counsel at all stages of the criminal process at which his substantial rights may be affected. *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972); *Mempa* v. *Rhay*, 389 U. S. 128, 134 (1967). In my view, that right to counsel extends to one appeal, provided the defendant decides to take an appeal and the appeal is not frivolous.[2]

The Constitution does not on its face define the phrase "assistance of counsel," but surely those words are not empty of content. No one would doubt that counsel must be qualified to practice law in the courts of the State in question,[3] or that the representation afforded must meet minimum standards of effectiveness. See *Powell* v. *Alabama*, 287 U. S. 45, 71

---

Rev. 961, 994 (1978); Project, 33 Stan. L. Rev. 951, 957, 962–964 (1981). Of course, a case presenting this question is unlikely to arise, for the very reason that a right of appeal is now universal for all significant criminal convictions.

[2] Both indigents and those who can afford lawyers have this right. However, with regard to issues involving the allocation of authority between lawyer and client, courts may well take account of paying clients' ability to specify at the outset of their relationship with their attorneys what degree of control they wish to exercise, and to avoid attorneys unwilling to accept client direction.

[3] Of course, a State may also allow properly supervised law students to represent indigent defendants. See *Argersinger* v. *Hamlin*, 407 U. S. 25, 40–41 (1972) (BRENNAN, J., concurring).

(1932). To satisfy the Constitution, counsel must function as an advocate for the defendant, as opposed to a friend of the court. *Anders* v. *California, supra,* at 744; *Entsminger* v. *Iowa, supra,* at 751. Admittedly, the question in this case requires us to look beyond those clear guarantees. What is at issue here is the relationship between lawyer and client— who has ultimate authority to decide which nonfrivolous issues should be presented on appeal? I believe the right to "the assistance of counsel" carries with it a right, personal to the defendant, to make that decision, against the advice of counsel if he chooses.

If all the Sixth Amendment protected was the State's interest in substantial justice, it would not include such a right. However, in *Faretta* v. *California,* 422 U. S. 806 (1975), we decisively rejected that view of the Constitution, ably advanced by JUSTICE BLACKMUN in dissent. Holding that the Sixth Amendment requires that defendants be allowed to represent themselves, we observed:

> "It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. . . . Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois* v. *Allen,* 397 U. S. 337, 350–351 (BRENNAN, J., concurring)." *Id.,* at 834.

*Faretta* establishes that the right to counsel is more than a right to have one's case presented competently and effectively. It is predicated on the view that the function of counsel under the Sixth Amendment is to protect the dignity and autonomy of a person on trial by *assisting* him in making choices that are his to make, not to make choices for him, although counsel may be better able to decide which tactics will be most effective for the defendant. *Anders* v. *California* also reflects that view. Even when appointed counsel believes an appeal has no merit, he must furnish his client a brief covering all arguable grounds for appeal so that the client may "raise any points that he chooses." 386 U. S., at 744.

The right to counsel as *Faretta* and *Anders* conceive it is not an all-or-nothing right, under which a defendant must choose between forgoing the assistance of counsel altogether or relinquishing control over every aspect of his case beyond its most basic structure (*i. e.*, how to plead, whether to present a defense, whether to appeal). A defendant's interest in his case clearly extends to other matters. Absent exceptional circumstances, he is bound by the tactics used by his counsel at trial and on appeal. *Henry* v. *Mississippi*, 379 U. S. 443, 451 (1965). He may want to press the argument that he is innocent, even if other stratagems are more likely to result in the dismissal of charges or in a reduction of punishment. He may want to insist on certain arguments for political reasons. He may want to protect third parties. This is just as true on appeal as at trial, and the proper role of counsel is to *assist* him in these efforts, insofar as that is possible consistent with the lawyer's conscience, the law, and his duties to the court.

I find further support for my position in the legal profession's own conception of its proper role. The American Bar Association has taken the position that

"when, in the estimate of counsel, the decision of the client to take an appeal, *or the client's decision to press a particular contention on appeal,* is incorrect[, c]ounsel

has the professional duty to give to the client fully and forcefully an opinion concerning the case and its probable outcome. *Counsel's role, however, is to advise. The decision is made by the client.*" ABA Standards for Criminal Justice 21–3.2, Comment, p. 21·42 (2 ed. 1980) (emphasis added).[4]

The Court disregards this clear statement of how the profession defines the "assistance of counsel" at the appellate stage of a criminal defense by referring to standards governing the allocation of authority between attorney and client at trial. See *ante,* at 753, n. 6; ABA Standards for Criminal Justice 4–5.2 (2 ed. 1980).[5] In the course of a trial, however, decisions must often be made in a matter of hours, if not minutes or seconds. From the standpoint of effective administration of justice, the need to confer decisive authority on the attorney is paramount with regard to the hundreds of decisions that must be made quickly in the course of a trial. Decisions regarding which issues to press on appeal, in contrast, can and should be made more deliberately, in the course of deciding whether to appeal at all.

---

[4] Cf. ABA Model Code of Professional Responsibility EC 7–7 (1980) ("the authority to make decisions is exclusively that of the client" except for decisions "not affecting the merits of the cause or substantially prejudicing the rights of a client"); *id.,* EC 7–8 ("the lawyer should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client").

[5] See also ABA Commission on Professional Standards, Model Rules of Professional Conduct, Rule 1.2(a) (Final Draft 1982). Rule 1.2(a) requires that "[a] lawyer shall abide by a client's decisions concerning the objectives of representation [if they are not illegal or unethical, or if, despite the fact that he considers them 'repugnant or imprudent,' the lawyer cannot withdraw without prejudicing the client], and shall consult with the client as to the means by which they are to be pursued." It is worth noting, however, that the commentary to Rule 1.2 discloses that its drafters' principal concern was the relationship between insurance company lawyers and insureds they represent, and that Rule 1.2 is intended to provide a basis for disciplinary action as well as general ethical guidance.

The Court's opinion seems to rest entirely on two propositions. First, the Court observes that we have not yet decided this case. This is true in the sense that there is no square holding on point, but as I have explained *supra,* at 758–759, *Anders* and *Faretta* describe the right to counsel in terms inconsistent with today's holding. Moreover, the mere fact that a constitutional question is open is no argument for deciding it one way or the other. Second, the Court argues that good appellate advocacy demands selectivity among arguments. That is certainly true—the Court's advice is good. It ought to be taken to heart by every lawyer called upon to argue an appeal in this or any other court, and by his client. It should take little or no persuasion to get a wise client to understand that, if staying out of prison is what he values most, he should encourage his lawyer to raise only his two or three best arguments on appeal, and he should defer to his lawyer's advice as to which are the best arguments. The Constitution, however, does not require clients to be wise, and other policies should be weighed in the balance as well.

It is no secret that indigent clients often mistrust the lawyers appointed to represent them. See generally Burt, Conflict and Trust Between Attorney and Client, 69 Geo. L. J. 1015 (1981); Skolnick, Social Control in the Adversary System, 11 J. Conflict Res. 52 (1967). There are many reasons for this, some perhaps unavoidable even under perfect conditions—differences in education, disposition, and socioeconomic class—and some that should (but may not always) be zealously avoided. A lawyer and his client do not always have the same interests. Even with paying clients, a lawyer may have a strong interest in having judges and prosecutors think well of him, and, if he is working for a flat fee—a common arrangement for criminal defense attorneys—or if his fees for court appointments are lower than he would receive for other work, he has an obvious financial incentive to conclude cases on his criminal docket swiftly. Good lawyers

undoubtedly recognize these temptations and resist them, and they endeavor to convince their clients that they will. It would be naive, however, to suggest that they always succeed in either task. A constitutional rule that encourages lawyers to disregard their clients' wishes without compelling need can only exacerbate the clients' suspicion of their lawyers. As in *Faretta*, to force a lawyer's *decisions* on a defendant "can only lead him to believe that the law contrives against him." See 422 U. S., at 834. In the end, what the Court hopes to gain in effectiveness of appellate representation by the rule it imposes today may well be lost to decreased effectiveness in other areas of representation.

The Court's opinion also seems to overstate somewhat the lawyer's role in an appeal. While excellent presentation of issues, especially at the briefing stage, certainly serves the client's best interests, I do not share the Court's implicit pessimism about appellate judges' ability to recognize a meritorious argument, even if it is made less elegantly or in fewer pages than the lawyer would have liked, and even if less meritorious arguments accompany it. If the quality of justice in this country really depended on nice gradations in lawyers' rhetorical skills, we could no longer call it "justice." Especially at the appellate level, I believe that for the most part good claims will be vindicated and bad claims rejected, with truly skillful advocacy making a difference only in a handful of cases.[6] In most of such cases—in most cases generally—clients ultimately will do the wise thing and take their lawyers' advice. I am not willing to risk deepening the mistrust

---

[6] I do not mean to suggest that this "handful" of cases is not important—it may well include many cases that shape the law. Furthermore, the relative skill of lawyers certainly makes a difference at the trial and pretrial stages, when a lawyer's strategy and ability to persuade may do his client a great deal of good in almost every case, and when his failure to investigate facts or to present them properly may result in their being excluded altogether from the legal system's official conception of what the "case" actually involves.

between clients and lawyers in all cases to ensure optimal presentation for that fraction of a handful in which presentation might really affect the result reached by the court of appeals.

Finally, today's ruling denigrates the values of individual autonomy and dignity central to many constitutional rights, especially those Fifth and Sixth Amendment rights that come into play in the criminal process. Certainly a person's life changes when he is charged with a crime and brought to trial. He must, if he harbors any hope of success, defend himself on terms—often technical and hard to understand—that are the State's, not his own. As a practical matter, the assistance of counsel is necessary to that defense. See *Johnson* v. *Zerbst*, 304 U. S., at 463. Yet, until his conviction becomes final and he has had an opportunity to appeal, any restrictions on individual autonomy and dignity should be limited to the minimum necessary to vindicate the State's interest in a speedy, effective prosecution. The role of the defense lawyer should be above all to function as the instrument and defender of the client's autonomy and dignity in all phases of the criminal process.

As Justice Black wrote in *Von Moltke* v. *Gillies*, 332 U. S. 708, 725–726 (1948):

> ". . . The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client. *Glasser* v. *United States*, 315 U. S. 60, 70. . . .
>
> ". . . Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision. And nowhere is this service deemed more honorable than in case of appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is peculiarly abhorrent" (footnote omitted).

The Court subtly but unmistakably adopts a different conception of the defense lawyer's role—he need do nothing beyond what the State, not his client, considers most important. In many ways, having a lawyer becomes one of the many indignities visited upon someone who has the ill fortune to run afoul of the criminal justice system.

I cannot accept the notion that lawyers are one of the punishments a person receives merely for being accused of a crime. Clients, if they wish, are capable of making informed judgments about which issues to appeal, and when they exercise that prerogative their choices should be respected unless they would require lawyers to violate their consciences, the law, or their duties to the court. On the other hand, I would not presume lightly that, in a particular case, a defendant has disregarded his lawyer's obviously sound advice. Cf. *Faretta* v. *California*, 422 U. S., at 835–836 (standards for waiver of right to counsel). The Court of Appeals, in reversing the District Court, did not address the factual question whether respondent, having been advised by his lawyer that it would not be wise to appeal on all the issues respondent had suggested, actually insisted in a timely fashion that his lawyer brief the nonfrivolous issues identified by the Court of Appeals. Cf. *ante*, at 750–751, n. 4. If he did not, or if he was content with filing his *pro se* brief, then there would be no deprivation of the right to the assistance of counsel. I would remand for a hearing on this question.