Andres **RODRIGUEZ**, Plaintiff,

v.

Robert **HANSLMAIER**, Superintendent, Defendant.

No. 96 Civ. 0867(JES).

United States District Court, S.D. New York.

Oct. 30, 1997.

Andres Rodriguez, Woodbourne, NY, pro se.

Donna Krone, Dist. Atty.'s Office, New York City, for Plaintiff.

Penny Rosenberg, Asst. Dist. Atty., N.Y. County, New York City, for Defendant.

## ORDER

SPRIZZO, District Judge.

The above–captioned action having come before this Court, and Magistrate Judge Andrew J. Peck having issued a Report and Recommendation to the Court dated August 7, 1997 recommending that Rodriguez's petition for a writ of habeas corpus be denied, and petitioner having failed to file any objections to this Report and Recommendation with the Court, and the Court having considered all matters raised, it is

ORDERED that the aforementioned Report and Recommendation is hereby adopted, and it is further

ORDERED that for the reasons set forth in the Report and Recommendation, Rodriguez's petition for a writ of habeas corpus shall be and hereby is denied, and it is further

ORDERED that the Clerk of Court shall dismiss the above–captioned action with prejudice.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

To the Honorable John E. Sprizzo,
United States District Judge.

Andres Rodriguez petitions for a writ of habeas corpus on the sole ground that he received ineffective assistance of appellate counsel, specifically, that on direct appeal appellate counsel failed to challenge Rodriguez's guilty plea, instead pursuing only a "frivolous" excessive sentence argument. (Petition, dated December 8, 1995, ¶ 12.)

For the reasons set forth below, I recommend that Rodriguez's petition be denied.

### FACTS

*Rodriguez's Guilty Plea*

On January 7, 1988, Rodriguez—represented by counsel, Joseph Monica—pled guilty to manslaughter. (Gov't Appendix ["App."] Ex. B: 1/7/88 Plea Tr. at 3.) Rodriguez stated that he had discussed his plea with his attorney, and that he understood that by pleading guilty he was forfeiting his right to a trial and forfeiting other constitu-

tional rights. Rodriguez testified that no threats or promises were made to induce his plea, except the Court's promise of a seven to twenty–one year sentence. (*Id.* at 3–5.) Rodriguez then allocuted to shooting and killing Edward Idala (spelled Ayala in some court documents) on July 25, 1987. (*Id.* at 7–9.)

*Rodriguez's Motion to Withdraw His Guilty Plea*

On January 22, 1988, Rodriguez moved pro se for reassignment of counsel, on the ground that before his guilty plea, his counsel (Monica) had not met with him and investigated his case. (*See* Gov't App. Ex. C: Rodriguez's Motion for Reassignment of Trial Counsel; Gov't Br. at 2.) Six days later, Rodriguez appeared for sentencing and moved pro se to withdraw his guilty plea on the grounds that he had not realized the full consequences of his plea and that he had pleaded guilty based on pressure from his attorney. (*See* Gov't Br. at 2; Gov't App. Ex. D: Rodriguez's Motion to Withdraw Guilty Plea.) The court granted Rodriguez's motion for reassignment of counsel, assigned Joseph A. Phillips to represent Rodriguez, and scheduled a hearing to determine whether Rodriguez's plea was knowingly and voluntarily entered, and whether he had received effective assistance of counsel. (*See* Gov't Br. at 2–3.)

The hearing was held on nine separate days between November 17, 1988 and June 20, 1989. (*See* Gov't Br. at 3; Gov't App. Ex. I: 3/16/90 Opinion of Justice Crane.) Rodriguez, Monica (his counsel at the January 7, 1988 plea proceeding), and three experts testified about Rodriguez's mental capacity to enter a knowing and voluntary guilty plea. (*See* Gov't Br. at 8; Gov't App. Ex. I at p. 2.)

Rodriguez testified at the hearing that he did not kill anyone, that Monica asked other inmates to convince Rodriguez to plead guilty, and that fellow inmates told him to "take the 7 to 21." (*See* Gov't App. Ex. F: Brief in Support of Petitioner's Motion to Withdraw Guilty Plea at 16.) Rodriguez testified that Monica told him to plead guilty to avoid a 25–year sentence if found guilty. (*Id.* at 17–18.)

Rodriguez's counsel at the time of his plea, Monica, testified that he did not recall viewing Rodriguez's videotaped confession, did not investigate Rodriguez's educational background, and did not have a psychologist determine Rodriguez's intellectual functioning. (*Id.* at 4–5.) Monica explained that he did not get a psychiatrist or psychologist to examine Rodriguez because it "wasn't necessary [since] [i]t was a simple question . . . [of whether Rodriguez did or did] not fire the shots that killed the person." (*Id.* at 6.) Monica testified that he thought Rodriguez was possibly slow, but that Rodriguez understood that he would get a reduced sentence in order to avoid trial. (*Id.* at 2–3, 5, 8–9.)

Dr. Robert Berger, Deputy Director of the Forensic Psychiatry Service at Bellevue Hospital, testified on Rodriguez's behalf. (*Id.* at 20.) Dr. Berger felt that Rodriguez's cleft palate and eye and head scars could be indicative of brain damage. (*Id.*) Dr. Berger testified that Rodriguez " 'was suffering from certain cognitive and intellectual impairment, and also emotional disabilities which had affected his ability to enter a plea at that time.' " (*Id.* at 21.) Dr. Berger opined that Rodriguez's impairments "required frequent repetition of questions, and a structuring and redirecting his attention toward the question in order to obtain a responsive reply." (*Id.* at 22.) However, Dr. Berger also testified that the fact that Rodriguez was mildly mentally retarded would not preclude a voluntary and knowing guilty plea. (*Id.* at 26–28.) Dr. Berger testified that "at the time of the plea [Rodriguez] understood that he was pleading guilty to having killed another individual, knew the evidence against him, understood the plea bargain . . . [but] at the time of the plea his will was overborne to some extent, the degree of which he could not state." (Gov't App. Ex. G: Gov't Mem. In Opposition to Motion to Withdraw Guilty Plea at 6.)

Dr. Richard Schuster, another expert in the field of psychology, also testified on Rodriguez's behalf. (Gov't App. Ex. F at 28.) Dr. Schuster also felt that Rodriguez's "eye and forehead deformity as well as his cleft palate" could possibly indicate "head trauma as well as possibilities of congenital difficulties in early childhood." (*Id.* at 28–29.) Dr.

Schuster testified that he gave Rodriguez psychological tests and found that "he tends to get confused very rapidly" in "situations that demand independent decision–making." (*Id.* at 32.) Dr. Schuster "stated that [Rodriguez] would look to counsel for advice in making a choice about entering a plea and that that was a natural thing to do." (Gov't App. Ex. G at 7.) Dr. Schuster testified that "the fact that someone is mildly mentally retarded would not preclude the knowing entry of a voluntary guilty plea." (Gov't App. Ex. F at 34.) Dr. Schuster, however, "could not render an opinion with a reasonable degree of clinical certainty as to whether [Rodriguez] was capable of entering a knowing and voluntary plea on the date of his plea in this case because, '[he] didn't do that type of investigation with him.' " (Gov't App. Ex. H: Gov't Reply Mem. at 14.)

Hillel Bodek, a clinical social worker (but not a medical doctor), testified for the government, over defense objections. (*See* Gov't App. Ex. G at 4, 8.) Bodek found that "although suffering from developmental disabilities, [Rodriguez] was not mentally retarded or significantly brain damaged, was malingering and had the capacity to enter a knowing a voluntary plea." (*Id.* at 4–5.) Bodek administered a battery of tests, and concluded that Rodriguez "was not particularly suggestible, to the contrary tending to be oppositional and passive–aggressive in his behavior and not able to be maneuvered into saying something he didn't want to say." (*Id.* at 9.) Bodek also found that Rodriguez understood the evidence against him and "pleaded guilty because of the plea offer to a lesser included offense." (*Id.*)

### The State Trial Court's Denial of Rodriguez's Motion to Withdraw His Plea

On July 7, 1989, Justice Crane denied from the bench Rodriguez's motion to withdraw his guilty plea. (Gov't App. Ex. E: 7/7/89 Sentencing Tr. at 4, 18–19.) Defense counsel reiterated his position that Rodriguez was "slow" and "retarded," was not adequately questioned during his plea colloquy to insure that he knew what he was doing, and did not receive effective assistance of counsel at his plea. (*Id.* at 11–14.) Rodriguez himself told the judge that he did not kill anyone and that

he had pled guilty only because his lawyer told him that if he did he would receive 7 to 21 years and otherwise would get 25 years to life. (*Id.* at 14–15.) Defense counsel asked leave to submit a lengthy brief. (*Id.* at 10.) Although satisfied from the lengthy hearings that Rodriguez's plea was knowing and voluntary, the court agreed to consider written argument after the hearing. (*Id.* at 8–10, 16; *see also* Gov't App. Exs. F, G & H.) Justice Crane held that Rodriguez's plea for mercy "demonstrate[s] to me that [Rodriguez is] quite capable of articulation and intelligence" and further found that Rodriguez "had no problems articulating his guilt" to "the taking of a life at virtually point blank range, where [Rodriguez] was witnessed in this act by at least one, if not more than one, non–interested third–party witness." (*Id.* at 16, 18.) Justice Crane sentenced Rodriguez to "the rather lenient sentence that has been promised," that is, 7 to 21 years. (*Id.* at 18–19.)

After reviewing Rodriguez's counsel's lengthy written submission (Gov't Aff. Ex. F), Justice Crane affirmed his denial of Rodriguez's motion to withdraw his guilty plea, in a written opinion issued on March 16, 1990. (*See* Gov't App. Ex. I: 3/16/90 Crane Opinion.) In his opinion, Justice Crane noted that the allegations that trial counsel had provided ineffective representation not only lacked merit, but rested on a faulty premise. (*Id.* at 13.) Rodriguez had alleged that Monica was ineffective for failing to view the videotaped statement, for failing to discern Rodriguez's mental problems, and for failing to "look into these problems in order, perhaps, to find a mitigating defense or, more severe, an incompetency to proceed." (*Id.* at 12–13.) Justice Crane found that Rodriguez's mental condition was not "anything approaching [legal] unfitness ... [nor] of a nature to suspect that defendant could present a defense of not responsible by reason of mental disease or defect ... [and] there was no reason for prior counsel to doubt defendant's fitness." (*Id.* at 13.) The judge also found Rodriguez's criticism of Monica for not previously viewing the videotape to be "nonsense," as Monica had a transcript and had succeeded in securing a hearing to suppress the tape, where he would have had the opportunity to view it. (*Id.* at 13–14.)

Justice Crane found Bodek's testimony to be "head–and–shoulders above the defense experts." (*Id.* at 5.) He noted that Bodek had studied Rodriguez "over a six month period entailing in excess of 70 hours." (*Id.* at 5.) Unlike the defense experts, Bodek "was familiar with the plea minutes and the relevant case law" and "legal standards." (*Id.* at 5–6.) Justice Crane found that Dr. Berger "lacked the thoroughness and accuracy necessary to assist the court," especially since Dr. Berger was "not conversant with the legal standards relevant to assessing the capability of a defendant to enter a knowing and voluntary plea." (*Id.* at 3.) Justice Crane found that Rodriguez's other expert witness, Dr. Schuster, actually "support[ed] the conclusion that [Rodriguez] understood the concept of a trial and that, even if [Rodriguez] relied on the advice of others, his plea could still have been knowing and voluntary." (*Id.* at 4.) Where the expert testimony conflicted, Justice Crane relied on "Bodek's opinions in preference to the experts called by the defense." (*Id.* at 6.)

As to Rodriguez himself, based on observing him at the time of the plea and sentencing and during the lengthy plea withdrawal hearings, Justice Crane found Rodriguez to be "evasive in the extreme," "self–serving" and "a malingerer." (*Id.* at 4–5.) Justice Crane found that Rodriguez was "very cognizant of the plea offer that would limit his sentence to 7 to 21 years and was mindful that a defeat at trial would result in as high a sentence as 25 years to life." (*Id.* at 8.) Justice Crane also noted that Rodriguez dropped his protestations of innocence and told his lawyer that he wanted to plead guilty "after hearing that the People were ready and, therefore, had control of the [eye] witness who defendant thought had been in foreign territory." (*Id.* at 8–11.) In sum, Justice Crane found "that whatever may be his mental, physical and intellectual deficits, [Rodriguez] had the capacity to, and in fact did, understand his rights, the sentence he could receive after trial, the consequences of his plea and the nature of the evidence against him. He was not so susceptible to suggestion as to detract from the voluntary nature of the plea." (*Id.* at 11.)

### Rodriguez's Direct Appeal

On direct appeal to the First Department, Rodriguez was represented by John H. Wilson. (*See* Gov't Br. at 3; *see also* Gov't App. Exs. J, K, L, O, P.) Wilson wrote Rodriguez that after reviewing the record and transcripts, he believed that the only appeal lay in a challenge to Rodriguez's sentence as excessive; Wilson recommended that Rodriguez not challenge the guilty plea because if he prevailed, Rodriguez would stand trial for murder in the second degree and could be sentenced to 25 years to life. (Gov't App. Ex. J: 8/8/91 Letter from Wilson to Rodriguez.)

Rodriguez responded with a letter agreeing with Wilson: ·

> As you indicate in your letter, *I also do not think it wise to challenge the plea, as I understand that if we win the murder indictment will be restored.*
>
> However, *I do wish that you challenge the length of my sentence,* and to assist you in preparing the brief, as you requested, kindly find enclosed copies of my program involvements since my incarceration, together with relative letters and certificates and some of my medical records.

(Gov't App. Ex. K: 8/29/91 Letter from Rodriguez to Wilson, emphasis added.)

Consistent with Rodriguez's agreement as to how to proceed on appeal, Wilson's brief to the First Department argued that Rodriguez's 7 to 21 year sentence was excessive. (Gov't App. Ex. L: Rodriguez's Br. to 1st Dep't; *see also* Gov't App. Ex. M: Gov't App. Br.) Wilson argued that the sentence was only slightly less than the maximum for that offense, far above the possible minimum sentence of two to six years. (Gov't App. Ex. L at 3.) Wilson argued that the sentence was excessive in light of Rodriguez's background, including his limited education and "diminished intelligence capacity." (*Id.* at 5.)

The First Department affirmed, upholding Rodriguez's sentence, without opinion. *People v. Rodriguez,* 184 A.D.2d 1092, 584 N.Y.S.2d 966 (1st Dep't 1992).

### Rodriguez's Collateral State Attack

Over two years later, Rodriguez filed a pro se writ of error coram nobis in the First Department, alleging that appellate counsel (Wilson) was ineffective. (Petition ¶ 11; Gov't App. Ex. O: Rodriguez Coram Nobis Motion, 7/24/94.) Rodriguez alleged that Wilson failed to brief issues concerning his mental deficiencies, the involuntariness of his guilty plea, and the ineffective assistance of original trial counsel, and instead pursued the "frivolous" excessive sentence appeal. (Gov't App. Ex. O at 6–8.) Amazingly, Rodriguez alleged that Wilson's letter to him was "merely a reiteration of the same intimidating discussion that [Rodriguez] had with [his] original lawyer who coerced [Rodriguez] into pleading guilty." (*Id.* at 5.) Yet Rodriguez admitted that by the time he received Wilson's letter, he was well aware of the consequences of having his guilty plea withdrawn because of the extensive plea withdrawal proceedings in the trial court. (*Id.*) Nevertheless, Rodriguez told the First Department that he "never authorized anyone to surrender [his] challenge to the guilty plea" but was "once again used and taken advantage of due to [his] disabilities." (*Id.* at 6.)

The First Department denied Rodriguez's coram nobis application without discussion, citing *People v. De La Hoz,* 131 A.D.2d 154, 520 N.Y.S.2d 386 (1st Dep't 1987). *People v. Rodriguez,* 211 A.D.2d 1011, 622 N.Y.S.2d 437 (1st Dep't 1995); Gov't App. Ex. R.

### Rodriguez's September 1995 Federal Habeas Petition

In September 1995, Rodriguez filed a habeas corpus petition in this Court, alleging that counsel during his plea bargain (Monaco) and his direct appeal (Wilson) were ineffective. (Gov't App. Ex. S: Rodriguez's Sept. 1995 Habeas Corpus Petition.) Finding the claim of ineffective assistance of trial counsel to be unexhausted, Chief Judge Griesa dismissed the petition without prejudice so that Rodriguez could either exhaust or drop his ineffective assistance of trial counsel claim. (Gov't App. Ex. T: 11/20/95 Griesa Order of Dismissal.) [1]

---

1. Implicitly, therefore, Judge Griesa found that Rodriguez's claim of ineffective assistance of appellate counsel was exhausted. This Court agrees, and holds that the government's half–

### Rodriguez's Present Habeas Petition

■ Rodriguez's present habeas petition, omitting the unexhausted claim, was received on December 20, 1995 and filed as of February 6, 1996.[2] Rodriguez raises a single ground for relief, that he was denied his constitutional right to effective assistance of appellate counsel. (Petition ¶ 12(A).) Specifically, Rodriguez alleges that appellate counsel failed to argue that there were "certain errors" committed by trial counsel which were preserved for direct appeal and instead pursued only one frivolous argument on appeal. (*Id.*) Because Rodriguez does not specify which "errors" appellate counsel allegedly failed to raise on appeal, the Court presumes Rodriguez refers to the same errors he complained of in his state coram nobis action.

### ANALYSIS

### RODRIGUEZ'S HABEAS CORPUS PETITION SHOULD BE DENIED BECAUSE HE HAS FAILED TO PROVE THAT HIS APPELLATE COUNSEL WAS INEFFECTIVE

**A. The Strickland v. Washington Standard**

The Supreme Court has announced a two–part test to determine if counsel's assistance was ineffective. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that he was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* This performance is to be judged by an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second–guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

*Id.* at 689, 104 S.Ct. at 2065.

Second, the defendant must show prejudice from counsel's performance. *Id.* at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068–69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated or trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking

hearted (*see* Gov't Br. at 15–16) claim that Rodriguez did not exhaust all aspects of his ineffective assistance of appellate counsel claim is without merit and barred by the "law of the case" doctrine.

2. Prior to enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "a petition filed after a previously submitted petition was dismissed without prejudice was not considered an abuse of the writ." *Camarano v. Irvin,* 98 F.3d 44, 46 (2d Cir.1996). Even after the AEDPA amendments, "a petition filed after a prior petition is dismissed without prejudice for failure to exhaust state remedies is not a 'second or successive' petition within the meaning of § 2244." *Camarano v. Irvin,* 98 F.3d at 47. Since Rodriguez's petition predates enactment of the AEDPA on April 24, 1996, it is to be analyzed under the pre–AEDPA habeas corpus rules. *Lindh v. Murphy,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

due account of the effect of errors on the remaining findings, *a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

*Id.* at 695–96, 104 S.Ct. at 2069 (emphasis added).

■ The Supreme Court has counseled that these principles "do not establish mechanical rules." *Id.* at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.* The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. at 2069.

■ The *Strickland* test applies to appellate as well as trial counsel. *See, e.g., Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994); *Ehinger v. Miller,* 942 F.Supp. 925, 932–33 (S.D.N.Y. 1996) (Mukasey, J. & Peck, M.J.); *Benn v. Stinson,* 917 F.Supp. 202, 205 (S.D.N.Y.1995) (Stein, J. & Peck, M.J.).[3]

■ Appellate counsel is not required to raise every colorable claim urged by the client, but is entitled to focus on key issues while "winnowing out weaker arguments." *E.g., Jones v. Barnes,* 463 U.S. 745, 751–53, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983); *Mayo v. Henderson,* 13 F.3d at 533; *Ehinger v. Miller,* 942 F.Supp. 925, 932; *Benn v. Stinson,* 917 F.Supp. at 206. Further, reviewing courts should not second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues. *E.g., Jones v. Barnes,* 463 U.S. at 754, 103 S.Ct. at 3314; *Tsirizotakis v. LeFevre,* 736 F.2d 57, 65 (2d Cir.), *cert. denied,* 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984); *Ehinger v. Miller,* 942 F.Supp. 925, 932–33; *Benn v. Stinson,* 917 F.Supp. at 206. Thus, a petitioner may establish constitutionally inadequate performance only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson,* 13 F.3d at 533; *see also, e.g., Ehinger v. Miller,* 942 F.Supp. 925, 932; *Benn v. Stinson,* 917 F.Supp. at 206.

### B. *Application of the Strickland Standard*

■ Rodriguez's habeas claim is based on an after–the–fact, Monday–morning quarterback approach. Viewed at the time of Rodriguez's direct appeal, and with the deference to counsel's strategy required by *Strickland,* the conduct of Rodriguez's state appellate counsel, Mr. Wilson, was objectively reasonable.

First, appellate counsel informed Rodriguez of the issue he intended to raise (excessive sentence) and the reasons he did not believe it wise to attack Rodriguez's plea. (Gov't App. Ex. J.) Importantly, Rodriguez agreed with this approach. (Gov't App. Ex. K.) He wrote appellate counsel that "I also do not think it wise to challenge the plea, as I understand that if we win the murder indictment will be restored. . . . I do wish that you challenge the length of my sentence." (*Id.*) Rodriguez's concurrence with Wilson's appeal strategy undercuts his present habeas petition. *See Dean v. Superintendent, Clinton Correctional Facility,* 93 F.3d 58, 62 (2d Cir.1996) (petitioner claiming ineffective assistance of counsel based on counsel's pursuit of a particular defense over defendant's objection "bears the burden of showing that he in fact objected"; if no objection is stated on the record, petitioner "must show not only that he 'disagreed' with counsel, but that his 'will was overborne by his counsel.'").

474 U.S. 52, 58–59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

---

**3.** The *Strickland* standard also applies to claims that a guilty plea was involuntary due to ineffective assistance of counsel. *E.g., Hill v. Lockhart,*

If, as Rodríguez *now* claims, he disagreed with appellate counsel's strategy, he should have advised appellate counsel at the time of the appeal, when counsel could have done something about it. Appellate counsel, of course, need not raise every issue his or her client wishes to be raised. *See, e.g., Curzi v. United States*, 773 F.Supp. 535, 542 (E.D.N.Y.1991) ("Moreover, although petitioners here do not contend that they urged counsel to argue the illegality of the search . . . on appeal, it is instructive to note that appellate counsel cannot be faulted for not pursuing even claims which his or her client presses him to pursue."). But if Rodriguez pressed the issue with his appellate counsel, he might have received new counsel, or counsel might have filed an *"Anders* brief," *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), raising the issue requested by Rodriguez while noting counsel's disagreement with the argument.

Nor can Rodriguez claim that he did not know enough to disagree with appellate counsel. Obviously, the federal courts cannot (and do not) expect a defendant to be a Clarence Darrow or Arthur Liman. And although Rodriguez may have been mentally slow, his pro se state coram nobis papers concede that by the time of his state appeal, he fully understood the arguments concerning the challenge to his guilty plea, because of the lengthy plea withdrawal hearings and briefs. (*See* Gov't App. Ex. O at 5.) The Court finds that despite Rodriguez's mental deficiencies, by the time of his state court direct appeal, Rodriguez knew of the grounds for challenging his guilty plea, and knowingly acquiesced in appellate counsel's decision not to raise those issues on appeal and instead to raise the excessive sentence appeal.

Even putting aside Rodriguez's acquiescence in appellate counsel's strategy, the Court cannot say that that strategy was constitutionally inadequate under *Strickland.*

Excessive sentence claims frequently are raised on appeal in the New York state courts. Here, Rodriguez was sentenced to 7 to 21 years for manslaughter, close to the maximum for manslaughter, and far above the 2 to 6 year minimum sentence that could have been imposed. Appellate counsel focused on Rodriguez's diminished mental capacity, his background and life circumstances, and the sentence's excessive length when compared with similar crimes, and Rodriguez's efforts since sentencing to improve his circumstances. (Gov't App. Ex. L.) While short, counsel's brief made the appropriate factual excessive sentence arguments.

Wilson's decision not to challenge Rodriguez's guilty plea also was a reasonable strategy decision under the circumstances. The trial judge's decision that plea counsel was not ineffective and that Rodriguez's plea was knowing and voluntary was based on his knowledge of Rodriguez's in-court behavior during lengthy proceedings, and on credibility assessments of the psychiatric witnesses. (*See* Gov't App. Ex. I.) Such a credibility-based decision was unlikely to be overturned on appeal. But even if it were overturned, an appellate "victory" would have resulted in vacating Rodriguez's guilty plea. That, of course, would mean that Rodriguez would be tried for murder and, if convicted, could be sentenced to 25 years to life. (Gov't App. Ex. B at 3.) While the record before this Court is not exhaustive as to the facts of the shooting death at issue, it appears that Rodriguez "was identified by several witnesses who had observed the offense and saw [Rodriguez] leaving the scene in his car." (Gov't App. Ex. A at p. 3) The presentence report also indicated that:

> The defendant [Rodriguez] was identified by witnesses. Several saw him running to his car after the shooting. Others identified his car, a red 1977 Mercury with temporary paper plates, and saw the car pull away after the incident. At least one witness saw the defendant walking with the victim and then pulling his gun and shooting him at close range. The defendant gave conflicting statements to the police . . . that he had been with the deceased earlier and drinking beer with him, but denied bringing him home or seeing him until after he had been shot and was lying on the sidewalk. Later, Rodriguez stated that the victim was with him at the store and he brought him back to where they had gone to buy cigarettes. While the defendant was waiting in his car, the

victim was making a phone call on the corner and an unknown man came and shot him.

(*Id.* at p. 4.) It is significant that, as Justice Crane found, Rodriguez decided to plead guilty after he learned that the eyewitness would be available to testify at trial. (Gov't Aff. Ex. I: 3/16/90 Opinion at 8–11.)

Therefore, it was not objectively unreasonable for appellate counsel to conclude that if he challenged Rodriguez's guilty plea on appeal, any "victory" in the appellate court would be a Pyrrhic victory.

### *CONCLUSION*

For the reasons set forth above, I recommend that the Court deny Rodriguez's habeas corpus petition on the merits, with prejudice.

### *FILING OF OBJECTIONS TO THIS RE-PORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable John E. Sprizzo, 40 Centre Street, Room 2201, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Sprizzo. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714

F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).