Ronald Leroy KENNEDY, Petitioner,

v.

Duane SHILLINGER and the Attorney General for the State of Wyoming, Respondents.

No. C–89–0062–B.

United States District Court, D. Wyoming.

March 19, 1991.

Daniel G. Blythe, Cheyenne, Wyo., for petitioner.

Karen Byrne and Paul Rehurek of Office of the Atty. Gen., State of Wyo., for respondents.

## MEMORANDUM OPINION AND ORDER DENYING PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. Section 2254

BARRETT, Senior Circuit Judge,
sitting by designation and appointment.

This matter came before the court on Petitioner Ronald Leroy Kennedy's "Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254" filed by and through his court-appointed attorney, Mr. Daniel G. Blythe, Esq., on December 10, 1990, and on the "Respondents Reply to Amended Petition for a Writ of Habeas Corpus" filed by and through their attorney, Mr. Paul S. Rehurek, Senior Assistant Attorney General, State of Wyoming, on February 22, 1991.

The court has read and considered the aforesaid Amended Petition and Reply and has carefully read and considered all pleadings filed herein, and the following records filed with the Clerk of Court of the First Judicial District Court for Laramie County, Wyoming, in criminal dockets Nos. 13–100, 13–101, 13–102 and 13–103, entitled *State of Wyoming v. Ronald Leroy Kennedy* and *State of Wyoming v. Jerry Lee Jenkins:* Trial Transcripts consisting of Vol. I (pp. 1–302); Vol. II (pp. 303–702); Vol. III (pp. 1–106 with 15 exhibits); Vol. IV (pp. 1–515A); Vol. V (pp. 516–889); Vol. VI (pp. 890–1198) and Vol. VII (pp. 1–406 with exhibits). In addition, the court has read, considered and reviewed Vol. I consisting of pages 1–151 of the Record on Appeal to the Wyoming Supreme Court in Nos. 4898 and 4899. The court, being fully advised in the premises, FINDS and ORDERS as follows:

### Background

Ronald Leroy Kennedy (Kennedy), Petitioner herein, and his co-defendant, Jerry Lee Jenkins, were convicted on May 1,

1974, of the first degree murder of Amy Alice Burridge, the forcible rape of Rebecca (Becky) Thompson, and assault with intent to commit murder upon Becky Thompson following jury trial and guilty verdict in the District Court of Laramie County, Wyoming. Following a direct appeal to the Wyoming Supreme Court, the death sentence imposed under § 6–54(b), Wyo.Stat. 1957, 1975 Cum.Supp., was set aside on constitutional grounds but the validity of the underlying conviction of first degree murder was upheld. *Kennedy v. State,* 559 P.2d 1014 (Wyo.1977). In that case, the Supreme Court observed that, "[s]ince no appeal has been taken from these convictions (forcible rape of Becky Thompson and assault with intent to commit murder upon Becky Thompson), they will receive no further notice, nor will the sentences thereunder be affected by this decision." *Id.,* n. 1, p. 1015. That same opinion stated that, "[p]ursuant to our statutory provision for automatic review in such cases, § 6–54(d), *supra,* we have independently examined the entire record for reversible error and find none except the impropriety of the sentence." *Id.* at 1018. Thereafter, the Wyoming Supreme Court affirmed the district court order resentencing Kennedy and Jenkins to life imprisonment, to be served consecutively to the sentences imposed for the other offenses committed upon Becky Thompson. *Kennedy v. State,* 595 P.2d 577 (Wyo.1979).

In the instant proceeding, this court has previously found that Kennedy has never been provided a Wyoming state court forum to present or consider his allegations of ineffective assistance of trial and appellate counsel (See "Order to Show Cause," dated April 3, 1990), even though these claims were substantially and fairly presented in the courts of the State of Wyoming by Kennedy, appearing *pro se* (See "Order Assessing All Costs and Fees Attendant Upon All Proceedings Arising From the Above–Entitled Matter Against Respondents," dated April 26, 1990).

Following an evidentiary hearing held on June 12, 1990, this court entered its Order dated August 17, 1990, finding that Kennedy had demonstrated that he did not knowingly and intentionally fail to raise the issue of the merits of his 1974 convictions on appeal to the Wyoming Supreme Court or to any courts of the State of Wyoming within a period of five (5) years following those convictions, or at any time thereafter. The court ordered the appointment of Mr. Daniel G. Blythe, attorney at law, Cheyenne, Wyoming, to represent Kennedy in this matter.

### Claims
### Advanced—Discussion/Disposition
### Claim I

Kennedy contends that his original trial and appellate counsel, Mr. John E. Ackerman (Ackerman), was ineffective "when he failed to raise the issue of the merits of his 1974 convictions to the Wyoming Supreme Court and specifically failed to raise the issue of the court's failure to sever the trial of Mr. Kennedy and his co-defendant."

### A.

### The Merits Claim

Kennedy relies on *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985), *reh'g denied,* 470 U.S. 1065, 105 S.Ct. 1783, 84 L.Ed.2d 841 (1985), for the proposition that "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney" in contending that Ackerman denied him an effective appeal when he refused to appeal on the merits, i.e., the sufficiency of the evidence, in support of the underlying 1974 convictions.

In response, Respondents contend that the state trial record in this case establishes by the overwhelming weight of the evidence the convictions of Kennedy and his co-defendant Jenkins. Respondents state that Kennedy's guilt was established beyond *all* doubt, not simply beyond a reasonable doubt. Further, Respondents point out that the standard to be used in judging the effectiveness of Kennedy's trial and appellate counsel is the test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Robison v. Maynard,* 829 F.2d 1501 (10th

Cir.1987); *Griffin v. West*, 791 F.2d 1578 (10th Cir.1986). This court agrees. *See also United States v. Rivera*, 900 F.2d 1462, 1472 (10th Cir.1990). Accordingly, in order for Kennedy to prevail on his claim of incompetent appellate counsel, he must show that counsel's performance was deficient and that the deficiency prejudiced his defense, i.e., deprived him of a fair trial and/or appeal.

This is not a case where Kennedy was denied an appeal, as in *Evitts v. Lucey, supra, Abels v. Kaiser*, 913 F.2d 821 (10th Cir.1990), and *Hannon v. Maschner*, 845 F.2d 1553 (10th Cir.1988). Here, in fact, Kennedy's death sentence was set aside by virtue of Ackerman's able representation on direct appeal to the Wyoming Supreme Court.

■ A defendant does not have a "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment decides not to press those points.... Legal contentions, like the currency, depreciate through overissue." *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983), cited with approval in *Evitts v. Lucey, supra*. In *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986), the court quoted from *Jones v. Barnes, supra* 463 U.S. at 752, 103 S.Ct. at 3313, that "[w]innowing out weaker arguments" is not a constitutionally deficient practice, but, instead, is the hallmark of effective advocacy.

■ In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126, the Supreme Court held that in a 28 U.S.C. § 2254 challenge to the sufficiency of the evidence in support of a state court conviction, the petitioner is entitled to federal habeas corpus relief only if he demonstrates that no rational trier of fact could have found proof of guilt beyond a reasonable doubt upon the record made and in terms of substantive elements of the criminal offense as defined by state law. *See also, Pilon v. Bordenkircher*, 444 U.S. 1, 100 S.Ct. 7, 62 L.Ed.2d 1 (1979); *Sanders/Miller v. Logan*, 710 F.2d 645, 652–53 (10th Cir.1983); *Soap v. Carter*, 632 F.2d 872 (10th Cir.1980), *cert. denied* 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981).

We have reviewed the entire trial transcripts above set forth. We hold that any rational trier of fact could, as the jurors did in this case, on the record's evidence as a whole, interpreted in the light most favorable to the prosecution, have found Kennedy guilty beyond a reasonable doubt. A summary of the evidence follows:

Rebecca K. Thompson (Becky), then age 18, and her half-sister, Amy Alice Burridge (Amy), age 11, drove in Becky's car from their home in Casper, Wyoming, to a grocery store to do some shopping about 9:00 p.m. on September 24, 1973. The two girls left the store to return to Becky's car. Two men who testified at trial, John Goedicke and Jim Hart, were seated in Goedicke's vehicle in the grocery store parking lot waiting for their wives to return from shopping and noticed both Becky and Amy leave the store and walk to Becky's car. Both men testified to Becky's and Amy's appearance.

Becky testified that she and Amy discovered that one of the tires on her car was flat. It was later determined that the tire had been sliced. A white, two-door Chevrolet Impala vehicle owned and operated by co-defendant Jerry Lee Jenkins (Jenkins), accompanied by Kennedy, had pulled into the parking lot adjacent to Becky's car. Kennedy exited Jenkins' vehicle and spoke with Becky about taking the girls to a station where the tire could be repaired. After some discussion, Amy phoned their mother, Mrs. Ralph Ivan Case, informed her of the flat tire, and told her that two "nice men" were going to help them fix the tire. Becky testified that after offering to help with the tire, Kennedy placed a knife against her rib cage and ordered Amy and her into Jenkins' car. Goedicke and Hart identified Kennedy in court as the man they saw speaking with Becky and Amy and testified that they observed the two girls entering Jenkins' car.

Shortly after they entered Jenkins' car, Becky and Amy asked the men where they were taking them. Instead of responding, Kennedy reached into the rear of the ve-

hicle, violently struck Becky and Amy with his fists, and proceeded to choke them. Becky and Amy cowered together on the floor in the rear seat section of the vehicle. Becky testified that during the ride, both Kennedy and Jenkins drank beer and were "pretty much drunk," but knew what they were doing. She believed that both men were acting crazy. Jenkins drove the vehicle, at Kennedy's direction, to a canyon area beyond Alcova some thirty miles from Casper and parked the car adjacent to the Fremont Canyon Bridge. Both Becky and Amy were terrorized. They asked if they were going to be killed. The girls expressed their love for each other.

In the pitch darkness, Kennedy took Amy from the car to see the "big man" in a nearby shed. Kennedy returned to the car without Amy, whose body was found by divers the next day in the water under the bridge. It was determined that Amy's death had been caused by severe damage to the structures at the base of her brain which could have resulted from a fall from such a height that the cervical spinal axis was forced through the base of the skull directly injuring the vital centers at the base of the brain. Amy also suffered multiple rib fractures, a collapse of the left lung, and extensive hemorrhaging in soft tissues surrounding the heart and at the base of her neck. A fall from the bridge to the bottom of the canyon involves some forty (40) feet. Sheer rock covered the area from the surface to the water on each side of the bridge.

After Kennedy returned alone to the car, he and Jenkins raped Becky, a virgin. She thanked them for not allowing her sister Amy to witness it. Becky believed—or hoped—that Amy was in the shed near the bridge. Becky was then taken by Kennedy and Jenkins to the bridge. Becky testified that both men walked steadily and did not slur their speech. The two men then threw Becky's struggling body from the bridge. She landed at the bottom of the rocky canyon some forty feet six inches from the bridge. During the course of the struggle on the bridge, Jenkins had choked Becky and remarked to Kennedy that they had to make sure that Becky died.

Miraculously, although badly injured, Becky managed to drag herself to the ground level adjacent to the bridge where she was found early the next morning by Mr. and Mrs. Strasser of Casper, who were on a fishing trip. Becky could not walk; her face was badly beaten; her left eye was almost swollen shut; she was nude except for a light sweater. The Strassers covered Becky, placed her in their car and drove her to Alcova where they telephoned the Sheriff and called for an ambulance. Becky was taken from Alcova to the Natrona County Memorial Hospital where she was examined and treated about 10:00 a.m. on September 25, 1973, by her family doctor, Arnold Krause, who testified that although Becky was cold and badly injured, she was alert, conscious and cooperative. Dr. Krause found severe bruises all over Becky's body, some of which required considerable suturing. Becky told of the ordeal, including that she had been raped, that the two men had attempted to strangle her, and that she had been thrown off the Fremont Canyon bridge. Becky's mother, Mrs. Case, who had reported her daughters' absence about midnight on September 24, 1973, after driving to the Thriftway Store some forty-five minutes after receiving Amy's telephone call, was called to the hospital to be at Becky's side. Mrs. Case identified the body of her daughter, Amy, that afternoon at the County Coroner's office.

Becky Thompson gave police a description of her two abductors and a description of the Jenkins' Chevrolet Impala vehicle. She shortly identified Jenkins and Kennedy as her abductors and they were arrested in Casper.

Medical experts testified that the serious facial and throat injuries to Becky were not due to the fall from the bridge, but rather were due to strangulation and blunt strikes to the face. The fall from the bridge, however, did result in various broken bones, fractures to Becky's pelvis and ilium, and the separation of Becky's sacroiliac joint. A pelvic examination disclosed lacerations and abrasions of the external opening of the vagina and white fluid in the vagina which proved to be semen-spermat-

zoa. There was definite injury to the hymenal ring, which was consistent with rape.

Additional corroborating and circumstantial evidence against Kennedy and Jenkins was devastating and overwhelming. For example: Becky's panties were found on the roadway near the bridge; an employee of a Casper Mini Mart, where Amy had gone to phone her mother about the flat tire, testified that he overheard Amy's remarks about the flat tire and that someone was helping to fix it; Goedicke and Hart identified Kennedy as the man who spoke to Becky and Amy before the girls entered Jenkins' car; hair samples removed from the back seat section of the Jenkins' vehicle were consistent with the hair of Becky and Amy; blood samples from the Jenkins' vehicle and on rocks in the canyon were consistent with the blood Group A attributable to both Becky and Amy; and a Casper optometrist identified an eye lens found on the back seat floor of Jenkins' car as one of the lenses he had fitted for Becky, stating that this left eye lens had been scratched almost beyond repair.

Neither Kennedy nor Jenkins testified. Further, Jenkins called no witnesses.

Kennedy, however, called a number of witnesses. Two of these witnesses testified that on September 24, 1973, Kennedy had charged two cases of beer and a pint of whiskey at the Sage Club in Evansville. Neither of them discerned anything about Kennedy indicating that he was drunk.

Doctor Nelson Frissell, a specialist in internal medicine, testified that he had seen Kennedy three times as a patient in 1972. Kennedy complained of hives, dizziness, pain behind his ears and neck, constant exhaustion, and weight loss. A physical examination did not disclose any physical disorders or disease. However, Kennedy's actions indicated anxiety and nervousness and chronic sighing respirations. Dr. Frissell prescribed Valium for Kennedy.

Frank Padilla, Kennedy's brother-in-law, testified that he had observed unusual behavior by Kennedy. Once, while the two were fishing in May of 1973 and when Kennedy had been drinking, Kennedy's eyes got big before he blacked out and fell to the ground. Again, in March of 1973, Kennedy came to the Padilla house, terrified because he had heard buzzing above his head. Kennedy's eyes were real big. On another occasion, Kennedy remarked to Padilla that he thought he was going to beat Padilla up. Padilla stated that Kennedy was acting crazy.

Marlene Padilla, Kennedy's sister, stated that Kennedy was all right until about 1973. She stated that in March, 1973, Kennedy ran to the Padilla home "white as a sheet" and with a real scared look in his eyes because of a cold feeling and a buzzing noise above his head. She and her husband, Frank, spoke with Kennedy for about an hour before he calmed down.

Diana Jean Kennedy, Kennedy's wife, testified that while Kennedy was in jail on the instant charges, he asked her to pick up some dirt and grass from the graves of their son and daughter who had died prematurely and bring them to him.

Clyde E. Harbaugh, an acquaintance of Kennedy, stated that one night Kennedy drove his car to the front of his (Harbaugh's) mother's home in Casper, jumped out, yelled vulgarities, and shot a gun twice, once into a parked car. Harbaugh was in his mother's home with June Green, who had been Kennedy's girlfriend.

Phyllis June Patrick, formerly June Green, testified that she was married to Kennedy on October 25, 1966, until March, 1968. She was pregnant when they were married. She was four months pregnant when he pushed her down, requiring hospitalization. She filed for divorce. Kennedy insisted that she had to sleep with him and, when she refused, he beat her up. She went to the hospital where it was ascertained that she had a broken nose. After the baby was born, she complained that Kennedy left her at home with the baby while he went drinking. On one occasion, Kennedy slapped her and knocked her to the floor. She stated that she was afraid of Kennedy.

Lorine Mullen testified that she had known Kennedy for twelve years. In July, 1972, she and her husband went with Kennedy to the Beacon Club in Casper. Ken-

nedy had been drinking. All of a sudden, Kennedy went into a "daze," his eyes were very wild and he was mumbling. About forty-five minutes later, Kennedy calmed down. About two weeks later, Kennedy came to the Mullen house where he drank. Again, his eyes became very wild and he was mumbling nonsense for about an hour. She recalled that his pupils were very big and that he was "wild eyed."

Hilda Kennedy, Kennedy's mother, testified that Kennedy was raised with four sisters and one brother in Casper. Kennedy's father did not work much and often frequented the bars. Accordingly, it fell upon Hilda Kennedy to provide for the family. She worked for years as a dishwasher, a vegetable peeler, a potato peeler and whatever was needed in order to provide groceries and clothing for the children. Her husband claimed that he was sick and could not work. He often came home drunk and he would threaten the children. She recalled that Kennedy was more susceptible to illness than the other children, and that he had nightmares. She recalled his imagining that a man was coming through the wall at night toward him. She considered him to be "odd, very odd." He was very fearful of thunderstorms and when they occurred, he pulled the shades down and covered up. On one occasion, he threw a plate of spaghetti in his father's face.

Frederick W. Cubin, M.D., of Casper, specializing in internal medicine, testified that he examined Kennedy on three occasions in December of 1972 and again on January 16, 1973, when Kennedy complained of inability to sleep, shortness of breath, palpitations, weak feelings and loss of weight. Dr. Cubin conducted a complete physical examination of Kennedy. The only physical findings were that Kennedy's hands tremored when extended and that Kennedy had a quick heartbeat which could account for Kennedy's shortness of breath, the pounding of his heart and the sensation of weakness. Dr. Cubin prescribed Injural to control the symptoms and referred Kennedy to Dr. Elkins, a Casper psychiatrist. Dr. Cubin believed that Kennedy had emotional problems which contributed to his quick heartbeat. He considered Kennedy to be very anxious and nervous.

In rebuttal, the prosecution presented the expert testimony of Lincoln D. Clark, M.D., a psychiatrist of the College of Medicine, University of Utah. Dr. Clark examined Kennedy at the Wyoming State Hospital for three days following his commitment there for observation and testing. He also was present at the trial and heard the testimony of Doctors Frissell and Cubin. Dr. Clark diagnosed Kennedy as one with an anti-social personality, with patterns of disturbed behavior. He said that he found no psychosis; rather, Kennedy had poor emotional control, and his outbursts of anger, like striking his wife, were consistent with the clinical diagnosis. Dr. Clark did not attach any significance to Kennedy's childhood fears, and he testified that the fast heartbeat condition is a relatively harmless type of condition which could account for palpitations and some cardiac complaints. Dr. Clark opined that on September 24 and 25, 1973, Kennedy knew the difference between right and wrong and knew the probable nature and consequences of his acts.

Dr. Clark was thoroughly and competently subjected to cross-examination by Kennedy's counsel, Ackerman, who pressed Dr. Clark as to whether Kennedy was suffering from schizophrenia on September 24 and 25, 1973. While acknowledging that Kennedy had an anti-social personality, Dr. Clark opined that he was and is responsible for his acts, is relatively composed and is not acting in a disturbed or violent fashion. He would not prescribe the drug of phenothiazine to Kennedy, a major chemical therapy for schizophrenia. Dr. Clark stated that schizophrenia is a form of serious mental illness often called insanity and that a person suffering therefrom often makes no sense, expresses wrong ideas or delusions and often behaves in bizarre fashions.

When asked by Ackerman about Kennedy's childhood involving a "brutal" father and a mother who was often away from home and Dr. Kalb's article that such a background would render a child unable to find conflict-free periods of personal inter-

actions, Dr. Clark opined that this would contribute to feelings of insecurity. Dr. Clark acknowledged Kennedy's complaints to Doctors Frissell and Cubin about loss of weight and he recognized that Dr. Kalb attributed this to a schizophrenic occurrence. Dr. Clark testified that Kennedy was examined at the Wyoming State Hospital in 1969 and diagnosed as one with an anti-social personality, and that in three complete examinations Kennedy did not display any symptoms of schizophrenia. He concluded his testimony by reiterating that Kennedy is not suffering from schizophrenia, but rather suffered from only a behavioral disorder.

At the close of the evidence, Ackerman renewed his motion for judgment of acquittal on the grounds that the prosecution had failed to show that Kennedy was not acting under an irresistible impulse or that Kennedy was able to form a specific intent. Counsel for Jenkins also renewed Jenkins' motion for acquittal. Both motions were denied.

Based on the overwhelming weight of the evidence of Kennedy's guilt, this court finds that there is no merit in Kennedy's contention that Ackerman denied him an effective appeal to the Wyoming Supreme Court by Ackerman's failure and/or refusal to challenge the merits, i.e., the sufficiency of the evidence, in support of Kennedy's 1974 convictions.

### B.

#### The Failure to Sever Claim

Kennedy contends that he was denied effective appellate counsel when Ackerman failed to raise the issue of the trial court's denial of his motion to sever his trial from that of his co-defendant Jenkins.

Kennedy points out that on the morning of trial, Ackerman renewed his motion for severance. Kennedy contends that the basis for Ackerman's motion was that the defenses were virtually totally and completely inconsistent. Kennedy fails to point out, however, that Ackerman concluded his oral argument on the motion by stating:

*The witnesses who will be testifying in behalf of the Defendant Kennedy will be in a position where I think it would bring quite a lot of prejudice to the case of Defendant Jenkins.* (Emphasis supplied).

(R., Vol. IV, p. 15).

Thus, in fact and in truth, Ackerman's motion was more concerned about the possible prejudice which might follow to co-defendant Jenkins than to Kennedy.

Kennedy entered a plea of not guilty and not guilty by reason of insanity to the charges contained in the information filed against him, which charges were identical in co-defendant Jenkins' case. Jenkins entered a plea of not guilty.

Neither defendant testified, and no confessions of either defendant were introduced at trial. Jenkins relied on the presumption of innocence and intoxication as his defense. He called no witnesses. Jenkins' counsel questioned Becky Thompson carefully as to whether Jenkins was drunk. Counsel argued to the jury that Jenkins was too inebriated to form a specific intent and that he was, in effect, under the control or influence of Kennedy. At one point in her testimony, Becky Thompson stated that when Kennedy left Jenkins' car with Amy at the Fremont Canyon Bridge, Jenkins remarked that he was always the weak one and that he did not want to go back to jail. Jenkins did not respond to Becky's question whether they (Jenkins and Kennedy) were going to kill Amy and her. Becky also testified that later it was Jenkins who was strangling her at the bridge and remarking to Kennedy that they had to be sure that Becky was killed.

Ackerman argued to the jury that the State had failed to show that Kennedy could have formed the specific intent required because of his insanity and inebriation or that he was capable of premeditation. In light of Kennedy's plea, the trial court instructed the jury venire that the burden of first going forward is on a defendant entering a plea of not guilty by reason of insanity. Ackerman questioned the jurors about the defense of insanity, explaining that once a defendant shows some evidence of insanity, the burden shifts to the State to prove sanity beyond a reasonable doubt. At the close of the prosecution's

case-in-chief, Ackerman moved to dismiss on the ground that the State had failed to prove that Kennedy was not so inebriated that he could form a specific intent or premeditate a killing.

Because Jenkins did not testify or present any witnesses, any prejudice to Kennedy's defense could only have resulted from arguments of Jenkins' counsel to the jury. To be sure, the bent of cross-examination of Becky by counsel for Jenkins was to establish that Kennedy was the principal player and that Jenkins was less culpable. Counsel for Jenkins did not, however, argue that his client was not a participant. Not only was this tactic logical, but it was consistent with the evidence which established that: It was Kennedy who approached Becky and Amy at the grocery store and it was he who forced the girls into Jenkins' car. It was Kennedy who directed Jenkins to drive to Fremont Canyon. It was Kennedy who violently attacked Becky and Amy with his fists and strangled them. It was Kennedy who, in threatening Becky and Amy, cut the upholstery in the Jenkins' car with a knife. It was Kennedy who removed Amy from the car at the Fremont Canyon Bridge.

The court finds that the arguments of Jenkins' counsel could not and did not prejudice Kennedy's defense. Under *Strickland v. Washington, supra,* it is the burden of Kennedy to overcome the strong presumption that his counsel's failure to raise the severance issue on appeal fell within the range of reasonable professional assistance and that failure to do so did not prejudice his appeal to the extent that there was a reasonable probability that the result of his appeal would have been different.

In 1973, the Wyoming Supreme Court, following the general rule, held that the grant or denial of a motion to sever is discretionary with the trial court and that the trial court's decision will not be disturbed unless prejudice is demonstrated by showing an abuse of discretion. *Linn v. State,* 505 P.2d 1270 (Wyo.), *cert. denied,* 411 U.S. 983, 93 S.Ct. 2277, 36 L.Ed.2d 959, *reh'g denied,* 412 U.S. 944, 93 S.Ct. 2780, 37 L.Ed.2d 405 (1973).

Severance is a matter of discretion with the trial court, and its denial will not be reversed unless a clear abuse is demonstrated. *Jasch v. State,* 563 P.2d 1327 (Wyo.1977). Defendants charged jointly "are not entitled to separate trials as a matter of right." *Bailey v. United States,* 410 F.2d 1209, 1213 (10th Cir.1969), *cert. denied* 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969). The decision to grant or deny a motion for severance will not be disturbed absent an abuse of discretion. *United States v. Cardall,* 885 F.2d 656, 667 (10th Cir.1989). A defendant bears a heavy burden of showing actual prejudice as a result of a denial to sever. *United States v. Hack,* 782 F.2d 862, 870 (10th Cir.), *cert. denied* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986).

■ In the instant case, it was more likely that Jenkins, not Kennedy, would contend (as inferentially he did) that his participation was minimal compared to that of Kennedy and that he may have been prejudiced by the "spillover" effect of joinder. *See Cardall, supra,* at 668. *See also United States v. Mabry,* 809 F.2d 671, 682–83 (10th Cir.), *cert. denied* 484 U.S. 874, 108 S.Ct. 33, 98 L.Ed.2d 164 (1987) ("The fact that evidence against one defendant is more incriminating than another is not, standing alone, a basis for severance.").

Significant, we believe, is the fact that except for the evidence presented by Kennedy in relation to his insanity defense, all of the evidence presented in the joint trial of Jenkins and Kennedy would have been admissible in separate trials. There is no showing in the record that the jury was unable to distinguish and separate the acts of co-defendants Kennedy and Jenkins, or that the jury did not follow the instructions given by the trial court. *Cardall,* 885 F.2d at 668. Those instructions include the admonishment that arguments of counsel are not evidence and are not to be considered as such by the jury in determining the issue of innocence or guilt.

The decision whether to grant a motion to sever is committed to the sound discretion of the trial court, and denial of a motion to sever will be disturbed only upon

a showing of actual prejudice. *United States v. Armendariz*, 922 F.2d 602, 609 (10th Cir.1990); *United States v. Hack*, 782 F.2d 862, 870 (10th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986). "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than against the moving party is sufficient to warrant a severance." *United States v. Hack*, 782 F.2d at 870. A defendant bears a heavy burden of showing actual, real prejudice to his case arising from the trial court's denial of severance, and the possibility that the defendant may have had a better chance of acquittal at separate trials does not warrant reversal on the basis of the trial court's denial of a severance. *United States v. Burrell*, 720 F.2d 1488, 1492 (10th Cir.1983).

In *United States v. Calabrese*, 645 F.2d 1379, 1384 (10th Cir.), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1982), *citing to United States v. Ready*, 574 F.2d 1009, 1015 (10th Cir.1978), it was held that a defendant's attempt to cast blame on the other is not in itself a sufficient reason to require separate trials. In *Ready*, the court acknowledged the animosity between the defendants and the defendant wife's intent to lay the blame entirely on the defendant husband. Citing to *Baker v. United States*, 329 F.2d 786 (10th Cir.), *cert. denied*, 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964), the court stated that "[h]ostility between co-defendants or the fact that one defendant may try to cast the blame on the other, is not in itself a sufficient reason to require separate trials." 574 F.2d at 1015.

We hold that Kennedy has not demonstrated that Ackerman was ineffective in failing to raise the trial court's denial of his motion to sever his trial from that of Jenkins.

## II.

■ Kennedy claims that he did not receive effective assistance of counsel because his plea of not guilty by reason of insanity was involuntary.

Kennedy acknowledges, and the record reflects, that Kennedy, with his attorney, entered a plea of not guilty by reason of insanity (Amended Petition, p. 11; R., Vol. VII, pp. 196–97). Kennedy did not voice any objections to the pleas. Furthermore, Kennedy was present and did not voice any objection or protest when (a) the trial judge instructed the jury venire that the burden of first going forward is on a defendant entering a not guilty by reason of insanity plea, (b) Ackerman questioned the prospective jurors about the defense of insanity, explaining that once a defendant shows some evidence of insanity, the burden is on the State to prove the defendant's sanity beyond a reasonable doubt, (c) Ackerman informed the jurors that at some point in the trial, the State would be required to prove that Kennedy was not suffering from a mental illness which would constitute a lawful excuse for his actions, and (d) Ackerman inquired of Becky Thompson whether she believed that Kennedy was "a monster, an insane, crazy monster."

In addition, Kennedy was committed by the district court to the Wyoming State Hospital for examination following his arrest. On October 24, 1974, Kennedy wrote to Ackerman challenging certain factual recitations in a report submitted by the State Hospital, particularly a representation that Amy had been sexually molested. He did not protest the examination.

Thus, the record demonstrates that Kennedy was present when his plea was entered and that prior to trial he acknowledged that he had reviewed a report submitted by the Wyoming State Hospital following his commitment and examination. There is nothing in the record demonstrating that Kennedy was forced by Ackerman to enter the not guilty by reason of insanity plea or to proceed with the insanity defense at trial. To the contrary, the record shows that Kennedy was fully informed by Ackerman of the insanity defense and that he agreed to its use in his defense.

Kennedy contends that, notwithstanding the above record references, he was denied effective assistance of counsel at trial inas-

much as the issue of his sanity was presented to the jury without his consent. The record refutes Kennedy's contention that he was unaware of a defense of insanity on the day of his trial. Kennedy entered the plea of not guilty and not guilty by reason of insanity in open court. He was examined at the Wyoming State Hospital and was aware of the report submitted relative to the examination. He was present when the court and Ackerman instructed and/or spoke to the prospective jurors relative to the sanity issue. At no time did Kennedy protest or object to the insanity defense at trial.

We are satisfied that the record before us is sufficiently complete to permit our review of Kennedy's ineffectiveness of counsel claim involving the trial use of the insanity issue. *Strickland v. Washington, supra,* as recently construed in *United States v. Rivera,* 900 F.2d 1462, 1472 (10th Cir.1990), requires that a defendant must show *both* that his attorney's performance fell below an objective standard of reasonableness *and* that, but for his attorney's inadequacies, the result of the trial would have been different. Thus, to show prejudice, it is necessary for Kennedy to show that there is a reasonable probability that the result of the trial would have been different had Ackerman not proceeded with the insanity defense.

In *United States v. Taylor,* 832 F.2d 1187, 1194–95 (10th Cir.1987), quoting *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069, the court held that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." And in *United States v. Owens,* 882 F.2d 1493, 1501 (10th Cir.1989), again quoting *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068, the court observed that "[i]t is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding.... '[A] reasonable probability is a probability sufficient to undermine confidence in the outcome.'"

We have fully reviewed the record. Based thereon, we conclude that the evidence of Kennedy's guilt is overwhelming. In our view, Ackerman crafted and presented the only feasible, available defense on Kennedy's behalf and did so most artfully. Keeping in mind that "[c]ourts must adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Burnett v. Kerr,* 835 F.2d 1319, 1321 (10th Cir.), *cert. denied,* 488 U.S. 830, 109 S.Ct. 84, 102 L.Ed.2d 61 (1988), and that a defendant must demonstrate that his "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment," *United States v. Hall,* 843 F.2d 408, 413–14 (10th Cir.1988), the court finds that Kennedy has failed to demonstrate that prejudice of constitutional dimension resulted from the performance of his trial counsel in presenting the insanity issue. The record reflects, in this court's view, that Kennedy's counsel presented the only logical, feasible defense, i.e., inebriation and insanity.

### III.

Kennedy has requested that his court-appointed counsel, Daniel S. Blythe (Blythe), raise certain issues which Blythe does not believe merit argument or which are not supported by the record. We agree with Blythe. Further, we agree with the Respondents' contention that none of Kennedy's *pro se* claims have any merit. Keeping in mind that it is the obligation of Kennedy to demonstrate that prejudice of constitutional dimension resulted from the performance of his trial and/or appellate counsel, the court finds that none of Kennedy's *pro se* contentions meet that standard.[1] Briefly, those contentions and this court's observations/findings thereon are:

1. Kennedy contends that both defense counsel stated in the presence of the court,

---

1. We note that, while we construe a *pro se* plaintiff's pleadings liberally, *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), this "does not constitute a license for a plaintiff filing *pro se* to ... expect the Court to decide what claims [he] may or may not want to assert. Therefore, if [a] plaintiff is asserting a claim for constitutional violations, he should do so with the requisite specificity...." *Jarrell v. Tisch,* 656 F.Supp. 237, 239 (D.D.C.1987).

in front of both prosecuting attorneys "that during the course of the state's case, they never saw anything fruitful to object to?" (Tr. T., pp. 684–85). Kennedy states that this is about as ineffective as any attorney could possibly get.

Respondents answer that failure to object to evidence cannot be considered error of counsel under *Strickland v. Washington, supra,* unless the evidence was inadmissible. Respondents point out that Kennedy does not identify what evidence was admitted that should have been excluded by an objection, nor how its erroneous admission prejudiced him. We agree. Kennedy's allegations are vague. It is only when counsel commits errors sufficiently egregious and prejudicial that a criminal defendant may demonstrate ineffective assistance of counsel. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Federal habeas corpus review of a state conviction is limited to correcting errors of federal constitutional dimension. *Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984). It is Kennedy's burden to prove that Ackerman's trial performance was both deficient and prejudicial to the extent that, but for the particular unprofessional errors demonstrated, the result would have been different. *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). In *Strickland,* the court noted:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

466 U.S. at 689, 104 S.Ct. at 2065. Here, Kennedy has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Jones,* 852 F.2d 1275, 1277 (10th Cir.1988).

■ 2. Kennedy contends that a change of venue to Cheyenne (from Casper) was "wrong" because the "Cloeman Turner case was the focus of attention in Cheyenne." Kennedy states that Ackerman did not object to venue in Cheyenne.

The record does not reflect the significance, if any there be, to the "Cloeman Turner case" in relation to the Kennedy–Jenkins' prosecution. We assume that Kennedy is asserting that he did not receive a fair and impartial trial because of the aura of the "Cloeman Turner case." The difficulty is that Kennedy has not demonstrated prejudice in any respect and this is his responsibility. *See Murray v. Carrier, supra; Strickland v. Washington, supra.* Kennedy has failed to demonstrate a federal constitutional issue cognizable under 28 U.S.C. § 2254.

■ 3. Kennedy alleges that the prosecuting attorney, Mr. Lewis, while talking to a juror member, made the statement in front of the entire jury to be selected, that "the state is entitled to have jurors who are outraged." Kennedy contends that he told Ackerman to move for a mistrial, and that Ackerman approached the bench and made a motion for mistrial, stating that the prosecutor's remarks had poisoned the entire panel of jurors and that a fair trial could not be obtained. Kennedy contends that Ackerman should have made this "one of the appeal points."

Respondents point out that Kennedy failed to note that after the trial judge denied the motion, he admonished the jury to ignore the remark. Respondents observe that there was no pattern of remarks of that nature made by the prosecutor and that, in view of those circumstances and the record as a whole, it cannot be concluded that the prosecutor's comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process," citing to *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting from *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). We agree. Based on the overwhelming evidence of Kennedy's guilt demonstrated by the record as a whole, Kennedy has not shown any reasonable probability that, but for Ackerman's alleged unprofessional error

(failure to raise the denial of mistrial motion on appeal), the result of his criminal trial would have been otherwise. "A federal court does not have supervisory jurisdiction over state courts and may overturn a state court conviction only when a defendant's constitutional rights have been violated." *Sanchez v. Heggie*, 531 F.2d 964, 967–68 (10th Cir.), *cert. denied*, 429 U.S. 849, 97 S.Ct. 135, 50 L.Ed.2d 122 (1976). Even in those instances where the court has concluded that the error was one of constitutional dimensions, still such error has been found to constitute harmless error beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Velarde v. Shulsen*, 757 F.2d 1093 (10th Cir.1985); *United States v. Barton*, 731 F.2d 669 (10th Cir.1984). Such would be the case here.

4. Kennedy contends that Ackerman made objections to the judge's jury instructions and that the issue of proper instructions should have been raised on appeal.

Respondents point out that Kennedy has failed to specify which instructions should have been appealed and how they were legally erroneous. Respondents cite *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973), for the rule that even an erroneous instruction will not support habeas corpus relief unless it infected the entire trial to the extent of denying due process, and cite *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203 (1977), for the rule that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." We agree.

5. Kennedy alleges that Ackerman would not let him testify. Respondents answer that the record refutes this contention. Respondents point out that it was Ackerman's advice to Kennedy that he not testify, but that it was Kennedy's decision to follow counsel's advice. We agree. The record is clear that Ackerman fully advised Kennedy of his right to testify in his own defense and that, while he advised against it, the decision was for Kennedy to make. On this basis, Kennedy elected not to testify. (R., Tr., Vol. VI, pp. 1021–23).

6. Finally, Kennedy asserts that the above reasons (one through five) demonstrate ineffective assistance of counsel and that their cumulative effect denied him the right of a fair trial.

Respondents answer that Kennedy has failed to establish any error on the part of Ackerman, but in any event he has failed to establish prejudice as required under *Strickland v. Washington, supra.* We agree.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Petitioner Ronald Leroy Kennedy's "Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2254" be and the same is hereby denied.