STATE OF MAINE
PENOBSCOT, SS.

FILED AND ENTERED
SUPERIOR COURT

OCT 02 2000

PENOBSCOT COUNTY

SUPERIOR COURT
Docket No. CR-99-740
JLH — PEN. - 10/2/2000
DONALD L. GARBRECHT
LAW LIBRARY

OCT 4 2000

Sheila Dennison,
        Petitioner

v.                          **DECISION AND JUDGMENT**

State of Maine,
        Respondent

Pending before the court is the petitioner's petition for post-conviction review. Hearing on the petition was held on May 12 and August 9, 2000. On both hearing dates, the petitioner was present with post-conviction counsel. Following the trial, the parties filed written argument.

I.

In April 1998, a single, three count indictment was returned against the petitioner, charging her with one count of kidnapping with the use of a firearm (count 1), see 17-A M.R.S.A. § 301, and two counts of criminal threatening with the use of a firearm (counts 2 and 3), see 17-A M.R.S.A. § 209. She entered pleas of not guilty, and, on the date of her arraignment, William Palmer, Esq. was appointed to represent her.

At a hearing held on September 1, 1998, the state orally moved to delete the allegation in count 1 that the defendant used a firearm in the commission of the kidnapping and, in its stead, to allege the use of a

1

dangerous weapon.[1] The motion was granted, and the petitioner entered no contest pleas to all three counts (including count 1 as amended). Pursuant to M.R.Civ.P. 11(d) and 11A(b), the state explained the terms of a sentence recommendation under which the state would recommend that the court impose a split sentence and, as the unsuspended portion of that sentence, a commitment of five years to the Department of Corrections; the petitioner reserved the right to recommend a lesser period of incarceration. Further, the length of the unsuspended sentence, the length of probation and the conditions of probation were open. Petitioner's counsel agreed that this correctly described the terms of the plea agreement, and the petitioner stated that she understood its terms. The court accepted the no contest pleas, entered findings of guilty and continued the matter for sentencing.

The sentencing hearing was held on October 22, 1998. The state had already submitted written statements from the two named victims, Darcy Clark and Melissa Mitro, but presented no further witnesses. The petitioner, through her attorney, elicited testimony from Carol Farnum (a licensed clinical social worker who had provided counselling to the petitioner subsequent to the criminal episode); Beverly Mullins (a licensed social worker who served as the petitioner's after-care worker prior to the incident, and who was present at the scene of the criminal incident); Dr. David Bear (a psychiatrist who treated the petitioner following the

---

[1]This amendment had the effect of eliminating a minimum mandatory four year sentence on count 1, which otherwise was required by 17-A M.R.S.A. § 1252(5). Instead, because count 1 alleged a class A crime committed with the use of a dangerous weapon, the sentencing court was required to give that use "serious consideration" when imposing sentence. 17-A M.R.S.A. § 1252(4).

incident); and Kathy Maietta (a licensed clinical social worker who assisted Dr. Bear in his treatment of the petitioner). Prior to the hearing, trial counsel had provided the court with letters from the petitioner's mother, Dr. Linda G. Peterson (the petitioner's psychiatrist), Dr. Judy A. Burk (the petitioner's treating psychiatrist subsequent to the incident), Lois Levisky (a psychotherapist who treated or consulted with the petitioner since 1982), Barbara R. Calveric (apparently a psychologist who evaluated the petitioner subsequent to the incident), Carol Farnum (who, as is noted above, also appeared and testified at the sentencing hearing), Ronald L. Story (a minister and a licensed practical nurse) and an ophthalmologist. Mr. Palmer then urged the court to impose a completely suspended sentence and explained the reasons supporting his position. Finally, the petitioner exercised her right of allocution and addressed the court.

After the parties had completed their presentations, the court discharged its statutory responsibility of determining the basic sentence, the maximum period of incarceration, the suspended portion of the maximum period of incarceration and the length of probation. See 17-A M.R.S.A. § 1252-C. On count 1, the court imposed a sentence of 10 years to the Department of Corrections, all but three of those years suspended and probation for six years. On counts 2 and 3, the court sentenced the petitioner to two concurrent one year commitments to the Department of Corrections, both to be served concurrently with the sentence on count 1.

In this post-conviction proceeding, the petitioner alleges that she was deprived of effective assistance of counsel, because trial counsel: (1) failed to challenge several aspects of the named victims' accounts of the incident in their written statements submitted to the sentencing court; (2) failed to

3

present certain information concerning the petitioner's efforts to obtain psychiatric help shortly prior to the criminal episode; and (3) improperly discouraged the petitioner from pursuing an appeal from the sentences.[2]

A post-conviction proceeding premised on a claim of ineffective assistance of counsel requires a petitioner to establish (1) that there has been "serious incompetency, inefficiency or inattention of counsel-performance of counsel which falls. . .below that which might be expected from an ordinary fallible attorney", and (2) that the ineffective representation "likely deprived the defendant of an otherwise available substantial ground of defense[]." *State v. Brewer*, 699 A.2d 1139, 1143-44 (Me. 1997).

## II.

### A. Failure to challenge victims' written statements (post-conviction petition counts 2, 3 and 5)

The petitioner contends that the written statements of the two named victims contained factually incorrect material and that trial counsel's performance was constitutionally deficient because he failed to challenge those inaccuracies. As identified in the amended petition, those factual issues will be discussed seriatim.

An examination of these challenges requires that considerable latitude be given to the strategic decisions of trial counsel. Levesque v.

---

[2]In count 4 of the post-conviction petition, the petitioner alleged that trial counsel failed to present evidence that she had recently started on prescription medication, which was relevant to sentencing issues. However, this allegation was not developed at the trial on the pending petition, and the petitioner has not pursued the issue in her written argument.

4

State, 664 A.2d 849, 851 (Me. 1995) (strategic and tactical decisions are "reviewable only for 'manifest unreasonableness.'"). Here, trial counsel was sensitive to the consequences of any challenges to the factual accounts of the victims of the petitioner's criminal acts. That the crimes involved the use of a firearm and a correspondingly high emotional impact on the victims makes that sensitivity reasonable. Additionally, during his presentation to the sentencing court, trial counsel argued that the petitioner expressed remorse and accepted criminal responsibility early on in the proceedings. He explained that the petitioner had been inclined to enter guilty pleas even at arraignment because she did not want to create the appearance that she was "calling them [the victims] liars." (T. 30.[3]) In order not to erode this legitimate observation, trial counsel himself needed to be cautious in his own challenges to the victims' descriptions of the incident.

## 1. Hollow-tip bullets (count 2)

In her victim impact statement, Melissa J. Mitro (one of the named victims) wrote: "Throughout my ordeal, Ms. Dennison continually told me that she was using hollow tip bullets, and explained to me the damage these bullets do when they exit the human body." In fact, based on the petitioner's own account, the record establishes that the petitioner did tell Mitro twice that she (the petitioner) had hollow tip bullets, and the petitioner had Mitro convey this information to the police who responded to the situation. Mitro asked the petitioner what this ammunition did, and the petitioner responded that the bullets break apart.

At the trial on the post-conviction petition, the petitioner explained

---

[3]Citations to the transcript of the sentencing hearing shall be: "T.__."

that gave this information to Mitro because she wanted Mitro to relay this information to the police in order to intimidate the police themselves. This underlying motivation, however, does not detract from the essential truth of Mitro's written recollection of this aspect of the incident. Any discrepancy in the number of times the petitioner made reference to the hollow tip bullets in her exchanges with Mitro is of secondary importance. The court is thus satisfied that trial counsel's failure to challenge this secondary point did not render his representation constitutionally deficient.

### 2. Locked in bathroom (count 3)

In her written statement, Mitro stated: "At times, I was locked in an interior bathroom without any windows. Not being able to see or hear what was taking place outside this room only added to my terror."

At the sentencing hearing, trial counsel and the petitioner herself specifically addressed this issue. Counsel advised the court that, during the incident, the petitioner put down her gun. She and Mitro both reviewed some paperwork. The petitioner then provided Mitro with food and drink. The petitioner was concerned that Mitro was exposed to harm because of the possibility of gunfire. As a result, the petitioner moved a "special chair" into the bathroom and "put" Mitro there because it was a place of relative safety. (T. 31.) In exercising her right of allocution, the Petitioner told the court:

> I did eventually put her in the bathroom, I never locked her in there because the lock is on the inside of the door. I put her in there for her own safety, I knew the house was surrounded with a SWAT team; it's a very glassy house. I didn't want anything to happen to her, and I simply didn't have any idea what was going to happen.

6

(T. 40.)

The petitioner now argues that trial counsel could have conclusively established at sentencing that the bathroom door could not be locked from the outside, by presenting a photograph showing the lock mechanism for the door. However, as even the petitioner's expert noted, the issue of the door lock can be seen as outweighed by the other evidence that revealed Mitro's predicament: the petitioner was armed, she had fired the gun inside the house in Mitro's presence, and she had directed Mitro to wait in the bathroom. While the sentencing justice later seized on this factual point, this court must assess counsel's performance from a prospective view, rather than post hoc. From that perspective, this court does not find that his failure to present extrinsic evidence of the lock mechanism deprived the petitioner of ineffective assistance of counsel.

### 3. Motivation of revenge (count 5)

Mitro wrote, in her submission to the sentencing justice:

Ms. Dennison also disclosed to me during this period why she was putting me through this. She stated that she had sued the company I was employed by for millions of dollars, and my employer's insurance company was only willing to offer two thousand dollars for a settlement. This action was her way to not only get revenge, but also to be in the media's spotlight. I don not know why she went to such great length for revenge, but then again, there are a lot of things that I do not understand.

The other named victim, Darcy Clark, expressed a similar sentiment in her written victim impact statement: "It is clear to me that Ms. Dennison was in control of a plan she carried out not considering lives she put in danger, and for what? Sour grapes from a frivolous lawsuit. . . ."

In fact, prior to the incident leading to the underlying prosecution,

7

the petitioner had filed an administrative grievance regarding mental health treatment that had been provided to her. The grievance was resolved in her favor. This was the apparent extent of any prior litigation. During the course of the criminal episode, the petitioner learned that Mitro was an employee of the same entity that was the subject of her grievance and that Mitro's supervisor (who dispatched the victims to the petitioner's house) was the person who committed the grieved act. From this, it is evident that the petitioner's conduct was not initially motivated by an interest in exacting revenge from persons affiliated with the organization that was the subject of her complaint.

Trial counsel made this point clearly at the sentencing hearing. Counsel presented the testimony of three mental health professionals who advised the court that, in their view, the petitioner's conduct was spontaneous rather than calculated. (T. 10, 14, 17.) Dr. Burk's written letter addressed to the sentencing judge reiterated this point. Further, the state even stipulated that the act was not premeditated. (T. 14.) Counsel himself then addressed the issue directly by stating that the petitioner was not "trying to seek revenge on somebody." (T. 24.) Finally, the petitioner told the court expressly that while she was holding Mitro in the residence, they discussed her agency, its employees and the petitioner's own mental health history. During that conversation, the petitioner learned that the individual respondent in the prior grievance was Mitro's supervisor and the person who had instructed Mitro and Clark to respond to the petitioner that night. (T. 39.) It was only at that point that the prior grievance

8

developed a role in the episode.[4]

In short, the record establishes that trial counsel presented considerable information undermining the victims' statements that the petitioner's criminal conduct arose from motivations of revenge and retaliation.

### 4. "Media spotlight"

In a related factual contention, Mitro wrote that the petitioner's conduct was designed "to not only get revenge, but also to be in the media spotlight." For the reasons noted above, trial counsel's presentation included a significant focus on the spontaneous and impulsive nature of the petitioner's decision to engage in the acts that led to her prosecution. Trial counsel also developed a factual argument that the petitioner panicked when the victims told her that they would seek involuntary commitment. (T. 9-10, 13, 17, 18, 21, 31, 37-38.)

Despite the fact that at the sentencing hearing the parties agreed on the record that the petitioner's conduct was not premeditated and the fact that the petitioner's trial counsel substantiated this point during the hearing, it is worthy of noted that _after_ the petitioner kidnapped Mitro, she (the petitioner) developed a keen interest in conveying certain information to the media. The summary of the state's evidence presented at the rule 11 hearing and the petitioner's testimony in this proceeding establish that after the petitioner learned that Mitro's supervisor was the respondent to the petitioner's earlier complaint, the petitioner had the

---

[4]Although not directly relevant to the question of counsel's performance prior to the court's explanation of its sentencing analysis, the court did find that the defendant's conduct was not premeditated. (T. 45.) Thus, it is clear that the court did not accept any suggestion that the defendant planned to commit her crimes.

police (who were present on the scene) contact a reporter from the Bangor Daily News. The petitioner then had Mitro read to that reporter the administrative decision that resolved the grievance favorably to the petitioner. The petitioner then released Mitro but asked the police to call a television news reporter. The police refused.

Thus, while trial counsel directly and effectively addressed the victims' assertions that the petitioner sought the "media spotlight," that allegation -- based on the petitioner's own acknowledgement -- nonetheless enjoyed factual support as it related to the petitioner's conduct after the situation had developed.

### 5. Held at gunpoint (count 5)

In her victim impact statement, Mitro recounted:

On March 6, 1998, I arrived as Ms. Dennison's house and within ten minutes, Sheila pulled out a gun and fired it several times. Not being from a family that owned guns, I hadn't ever been that close to one that has gone off. . . .I was held at gunpoint for the next several hours not knowing if I was going to live or die.

The first portion of Mitro' statement is undisputed. When Mitro told the petitioner that she intended to seek an involuntary commitment, the petitioner grabbed a rifle. As the petitioner herself told the sentencing court, "I had it [the firearm] in my hand and walked to the living room and fired off a few rounds into the ceiling to let them [the victims] know it worked." (T. 38.) The petitioner went on, however, to say that while she released Clark and "kept" Mitro, the petitioner took steps to make Mitro comfortable (for example, by letting Mitro sit in the most comfortable chair in the residence) and to try to make her safe (by putting her in the bathroom, as is discussed above). (T. 39-40.) Further, the petitioner and

10

Mitro spent some time discussing her agency, the nature of her work and the petitioner's experience in mental health treatment. (T. 39.) As trial counsel advised the court, before the petitioner and Mitro became engaged in that less threatening exchange, the petitioner put down her gun and walked around other areas of the house. (T. 31.)

Thus, the record establishes that trial counsel in fact challenged Mitro's account of the extent to which the petitioner used her firearm during this incident. The petitioner has not provided any other evidence on this issue that she contends trial counsel could or should have presented to the sentencing court.

### 6. Role of Darcy Clark (count 5)

In her written sentencing submission, Clark referred to "the March 3rd kidnapping of myself. . . ." She also wrote that she was "held hostage and threatened with a firearm. . . ." The petitioner correctly notes that she was not charged with kidnapping Clark. Rather, Mitro was the sole alleged kidnapping victim.

In this proceeding, the petitioner confirmed that when she seized the firearm and fired several shots into the ceiling, Clark was present. Further, the petitioner testified that Clark remained in the house for an additional 20 minutes. Then, as she described it at the sentencing hearing, she "let Darcy [Clark] go." (T. 39.) From this, the court concludes that the petitioner's own description of the incident provides factual support for Clark's statement, even though the petitioner was not charged with kidnapping Clark.

11

B. Failure to present evidence regarding recent efforts to obtain psychiatric assistance (post-conviction petition count 6)

The petitioner next contends that trial counsel failed to present evidence that she had sought mental health intervention prior to the criminal episode. At the trial on the pending petition, the petitioner's treating psychiatrist, Linda Peterson, M.D., testified that earlier on the date of the incident, the petitioner called her and seemed to be in some distress. Because Dr. Peterson was in the process of leaving the state, she was unable to work with the petitioner herself, but rather she advised the petitioner to call a crisis hotline. (The court infers that the petitioner followed that advice and that the crisis agency responded by dispatching Mitro and Clark to the petitioner's residence, where the crimes were then committed.) Prior to sentencing, Dr. Peterson submitted a letter to the court to express her opinion on the effect of incarceration on the petitioner. However, trial counsel did not present evidence regarding the contact between the petitioner and her doctor on March 6.

The failure of a defendant to submit to and comply with mental health treatment may be viewed as an aggravating factor under 17-A M.R.S.A. § 1252-C(2). State v. Michaud, 590 A.2d 538, 545 (Me. 1991). Here, however, trial counsel presented evidence that the petitioner in fact sought such intervention. Indeed, the petitioner's attempt to obtain psychological assistance led to this incident, when the mental health workers went to her residence.

Additionally, the evidence developed by trial counsel showed clearly that the petitioner had a long standing history of mental health treatment with a number of providers. Unlike the circumstances considered in

12

Michaud, where the defendant had not show amenability to treatment, the petitioner's history of cooperation was presented effectively as a mitigating factor that was relevant to the formulation of the maximum period of incarceration. That, on this particular occasion, the petitioner previously turned to her psychiatrist adds little to the basic points that on the date of the incident, she sought help and that historically she was cooperative with the therapeutic efforts of others.

Finally, in expressing the basis for its sentence, the court did not identify lack of submission to mental health treatment as an aggravating factor.

Thus, the petitioner has not established either that the petitioner was deprived of effective assistance of counsel through counsel's failure to present evidence of contact between the petitioner and Dr. Peterson shortly before the incident, and she has not established prejudice.

### C. Discouraging petitioner from filing appeal from sentence (post-conviction petition counts 1 and 8)

Finally, the petitioner contends that she was deprived of effective assistance of counsel when he discouraged her from applying for leave to appeal the sentences pursuant to 15 M.R.S.A. § 2151 et seq. The petitioner was in fact dissatisfied with the sentence imposed by the court, and she and trial counsel discussed her appellate options. Trial counsel believed that an appeal would be unsuccessful.[5] He also was aware of the possibility that, if such an appeal were successful, the petitioner would be exposed to

---

[5]His testimony did not reveal whether he expected no success with an application for leave to appeal pursuant to section 2153 or whether he felt that plenary review would not result in an order vacating the sentence. Although the court infers the former to be the case, this ambiguity is not important here.

13

a sentence greater than the one at issue here. Ultimately, the petitioner agreed not to seek leave to file an appeal. From the testimony of the petitioner and trial counsel, however, it is also clear that she made her decision with considerable reluctance.

The first step in the analysis of this claim involves an identification of the elements the petitioner must establish. The court draws guidance from the Supreme Court's opinion in Roe v. Flores-Ortega, 528 U.S. ___, 145 L.Ed.2d 985 (2000). There, on a federal habeas corpus petition, the petitioner claimed ineffective assistance of counsel where the petitioner had not given instructions to counsel regarding an appeal and where counsel failed to file such an appeal. The court noted prior precedent that a habeas corpus petition, based on counsel's failure to file an appeal, fails when the petitioner gave explicit instructions to counsel not to file an appeal; and a petition must be granted when counsel fails to execute the client's instructions to file such an appeal. Id. at ___, 145 L.Ed.2d at 995. In the intermediate circumstances presented in Roe, the Court gave specific content to the two Strickland criteria.

First, the claim of deficient performance rests on the question of whether, under the circumstances, trial counsel had a duty to consult with the petitioner regarding an appeal. Such a duty to consult arises "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." 528 U.S. at ___, 145 L.Ed.2d at 995. The Court explained that it uses "the term 'consult' to convey a specific meaning -- advising the defendant about the advantages and

14

disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." Id. at ___, 145 L.Ed.2d at 996. In other words, a consultation in this context carries qualitative requirements. Then, if counsel discharges this constitutional duty of consultation where it exists,[6] counsel's performance is constitutionally defective only by failing to carry out the client's wishes.

Here, after sentence was imposed, trial counsel and the petitioner discussed the possibility of an appeal. Based on this record (which does not include much evidence on this point), the court can find only that trial counsel advised the petitioner that there was no basis for an appeal and that if the sentence were vacated on appeal, then on remand she would face the possibility of a sentence greater than the one at issue here.

The latter concern is clearly a legitimate one. See United States v. DiFrancesco, 449 U.S. 117, 137-38, 66 L.Ed.2d 328, 346 (1980) (a criminal sentence is subject to increase on appeal if that increase does not defeat the defendant's legitimate expectation that the original sentence was final), cited in State v. Hersom, 663 A.2d 3, 6 (Me. 1995); see also United States v. Moreno-Hernandez, 48 F.3d 1112, 1116 (9th Cir.), cert. denied, 515 U.S. 1151 (1995) (a defendant has no legitimate expectation of finality in a sentence that the defendant challenges on appeal).

However, there is no evidence in this record that trial counsel meaningfully discussed with the petitioner any grounds that might have warranted consideration of an appeal of the sentence. Indeed, from counsel's testimony at the hearing on the pending petition, he did not

---

[6]The court noted that in limited circumstances, counsel may not be subject to a duty of consultation. 528 U.S. at ___, 145 L.Ed.2d at 996-97. Those circumstances are not present here.

15

detect any nonfrivolous issues to raise on such an appeal. This court concludes differently.

Pursuant to 17-A M.R.S.A. § 1252-C, the sentencing court articulated the factors that it found relevant to the three step sentencing analysis that was required in this case. In establishing the basic sentence pursuant to section 1252-C(1), the court noted, among other things, that the defendant's conduct during the criminal episode involved the use of a weapon and thus was highly threatening to and stressful for the victims. (T. 44-45.) This circumstance is clearly relevant to the question of where this particular incident lies on the spectrum of all ways such an offense could have been committed. See State v. Roberts, 641 A.2d, 177, 178 (Me. 1994). Next, in determining the maximum period of incarceration, the court noted several aggravating factors. These included what were arguably, in effect, some of the same factors used by the court in establishing the basic sentence. In particular, the court reiterated its observation that the defendant's conduct was committed "in a manner to inflict distress upon the victims." (T. 46.) The court further construed the evidence to show that the petitioner was angry during the incident and manipulated the circumstances to attempt to make contact with members of the media, all while holding Mitro as a hostage.

This analysis creates the basis for an argument that the sentencing court invoked a single factor (the conduct of the petitioner that resulted in emotional distress to one or both victims) twice: in setting the basic sentence, and then again as an aggravating factor in determining the maximum period of incarceration. Such an approach would be subject to legitimate challenge under State v. Shulikov, 712 A.2d 504, 511 (Me.

16

1998). If so, then there would exist a nonfrivolous basis for an appeal from sentence under 15 M.R.S.A. § 2151 et seq.

This issue was apparently not detected by trial counsel, and in any event trial counsel did not discuss it with his client. Counsel had a duty to "consult" with the petitioner under these circumstances because of her actual dissatisfaction with the sentence imposed by the court and because of the existence of an arguable nonfrivolous ground of appeal from sentence. See Roe, 528 U.S. at ___, 145 L.Ed.2d at 995. The importance of such a consultation on this issue is heightened by the fact that, in this case, the proper identification of factors relevant to the second of the three section 1252-C steps was particularly important: those considerations included the lack of a criminal record, acceptance of responsibility for the conduct and (particularly) a long-standing of mental health issues for which the petitioner had accepted and responded to treatment. The crimes themselves were characterized by aggravating factors, as the sentencing court noted. Thus, to obtain the best possible results for the petitioner, trial counsel needed to draw emphasis to the mitigating factors relevant to the maximum period of incarceration. As the petitioner has acknowledged, trial counsel did so. However, trial counsel also needed to pay particular attention to the manner in which those mitigating factors were balanced against the aggravating factors in that same stage of the sentencing analysis. This is where the problem lies.

The court finds that these failures by trial counsel bring this aspect of his representation of the petitioner to a level below that expected of ordinary fallible lawyers. Because of this, the petitioner did not have the opportunity for meaningful consultation with her attorney on the issue of

17

an appeal from sentence, as the notion of consultation has been defined in Roe.

As a result, the petitioner was, in effect, unconstitutionally deprived of her opportunity to pursue an appellate proceeding. In these circumstances, prejudice is established if the petitioner shows that she would have taken an appeal "but for" counsel's deficient performance. Roe, 528 U.S. at ___, 145 L.Ed.2d at 1001.[7] Here, the court finds that the petitioner has satisfied this burden. The petitioner was dissatisfied with the sentence, she and her attorney actively discussed her interest in an appeal of the sentence, she acceded to his advice reluctantly, and in fact there existed a nonfrivolous ground to pursue an appeal.

This court does not presume to conclude that, in fact, the sentence was affected by a defective analysis. Roe expressly eliminates such a showing by a petitioner in a case such as this, and this court need not address that question because under the present circumstances, prejudice is presumed. Additionally, the petitioner has raised a number of other challenges to the court's sentencing analysis. The court need not -- and

---

[7]The state argues that because an appeal from sentence is discretionary, the petitioner must prove here that she would have prevailed on such an appeal, in order to establish prejudice. The court disagrees. As Roe holds, prejudice is presumed when counsel's constitutionally deficient representation results in the loss of a client's appellate rights. That the petitioner in Roe may have had the right to a direct appeal does not distinguish it from the present case. There is in fact no constitutional right to an appeal in a criminal case. State v. Collins, 681 A.2d 1168, 1169 (Me. 1996); Jones v. Barnes, 463 U.S. 745, 751, 77 L.Ed.2d 987, 993 (1983). Where, however, such a right exists under some other authority, an appellant has the right to effective assistance of counsel. Douglas v. California, 372 U.S. 353, 357, 9 L.Ed.2d 811, 814-15 (1963) (a defendant has a right to counsel on appeal); Stack v. State, 492 A.2d 599, 601 (Me. 1985) (where there exists a right to counsel, there exists a right to effective assistance of counsel). Here, an applicant for appeal from sentence does not have a "right" to plenary review of that sentence. Rather, it is discretionary with the Sentence Review Panel under 15 M.R.S.A. § 2152. Because that avenue exists, then in that process, a petitioner is entitled to effective legal representation.

therefore does not -- reach those issues. Rather, this court finds only that an arguable basis for a nonfrivolous appeal was generated by this sentence and that, under Roe, the petitioner's decision not to pursue the appeal was the direct result of ineffective assistance of counsel. Accordingly, the petitioner's right to file an application to appeal from sentence will be reinstated. See Stack v. State, 492 A.2d 599, 603 (Me. 1985). Her pending motion for bail is denied because bail is not available pending an application to appeal from sentence. See 15 M.R.S.A. § 2157.

The entry shall be:

For the reasons set out in the order dated October 2, 2000, the petition for post-conviction relief is granted in part. The time in which the petitioner may file an appeal from sentence pursuant to 15 M.R.S.A. § 2151 et seq. is enlarged to October 22, 2000.

The petitioner's motion for bail is denied.

Dated: October 2, 2000

_____
JUSTICE, SUPERIOR COURT

State:
    C. Daniel Wood
        Assistant DA

Petitioner:
    Stuart Tisdale
    P.O. Box 572
    Portland ME